Federico M. Bandi
Angela M. Bandi
3606 Chesapeake Street, NW
Washington, DC 20008
Telephone: 773.620.1932
Email: fbandi1@jhu.edu
       angela.bandi@yahoo.com

**FILED**

**APR 1 6 2025**

Clerk, U.S. District and
Bankruptcy Courts

*Unsecured Judgment Creditors of Touchstone Remodelers, LLC, filing Pro Se*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | |
| | |
| TOUCHSTONE REMODELERS, LLC, | Case No. 23-00116-ELG |
|           Debtor. | Chapter 7 |
| | |
| FEDERICO M. BANDI and | |
| ANGELA M. BANDI, | |
|           Plaintiffs, | |
| | |
| vs. | Adversary No. _____ |
| | |
| BENJAMIN ROBERT SRIGLEY, | |
| CYNTHIA TYBURCZY SRIGLEY, | |
| TOUCHSTONE REMODELERS, LLC and | |
| SRIGLEY DEVELOPMENT COMPANY, | |
| LLC, | |
|           Defendants. | |

**COMPLAINT**

On October 17, 2024, Federico M. Bandi and Angela M. Bandi, Plaintiffs and creditors of

the above-named Debtor, Touchstone Remodelers, LLC, filed with this Court their *Motion for an*

*Order Granting Derivative Standing to Prosecute on Behalf of the Estate, Claims Against the*

*Debtor, Benjamin Robert Srigley, Cynthia Tyburczy Srigley, and Srigley Development Company,*

*LLC* (the "**Motion for Derivative Standing**"). Upon information and belief, as of the date of this

filing, the Court has not yet issued an order on the motion.

However, Plaintiffs understand that the statute of limitations for filing certain claims in

this case may run on or about April 28, 2025.[1] For the purpose of preserving their potential future

rights to prosecute this adversary proceeding in the event this Court grants the Plaintiffs

derivative standing, Plaintiffs are filing this Complaint before the expiration of the two-year

statute of limitations period.

Plaintiffs state the following in support of this Complaint against Benjamin Robert

Srigley, Cynthia Tyburczy Srigley, Touchstone Remodelers, LLC (the "**Debtor**"), and Srigley

Development Company, LLC (collectively, the "**Defendants**"):

## PRELIMINARY STATEMENT

1.      Touchstone Remodelers, LLC was a sham used by Benjamin Robert Srigley and

Cynthia Tyburczy Srigley (jointly, the "**Srigleys**") to enrich themselves well beyond what was

justifiable given the Debtor's financial condition.

2.      The Srigleys' scheme is clear: use the Debtor as a piggy bank and extract all of its

available assets (owned and borrowed), such that, when it was no longer convenient for the

Srigleys to continue the Debtor's business operations, they could shut down the entity at any

time and walk away. This strategy permitted them to maximize their personal gain and use the

LLC status of the Debtor to shield assets from potential creditors. This was a scheme the Srigleys

---

[1] On April 28, 2023 (the "**Petition Date**"), the Debtor commenced its Chapter 7 case by filing a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "**Petition**"). *See* 11 U.S.C. § 526(a).

carried out over time; it was the way in which they ran the Debtor's business generally, and not

solely reflective of their behavior in the months immediately prior to the Petition Date.

3.      During at least the three years prior to the Petition Date, the Debtor was in a

perpetual state of insolvency. Upon information and belief, this indebtedness was due, in part, to

the Srigleys' pattern and practice of overcompensating themselves by draining the Debtor of its

cash assets and of using the Debtor's assets and credit for their personal expenditures.

4.      The entity was also insolvent due to the Srigleys' use of the Debtor's business to

fraudulently obtain funds by taking out loans or other credit in the Debtor's name, even though

they were well aware the Debtor had no means of repaying the debts.

5.      Upon information and belief, from early January of 2020 through the Petition

Date,[2] the Srigleys apparently caused the Debtor to fraudulently transfer not less than

$457,070.95[3] in cash assets or other value to the themselves (the "**Avoidable Transfers**"). The

Avoidable Transfers are listed on the attached **Appendix A**.

6.      The $457,070.95 in Avoidable Transfers does not include an additional

$14,568.47 in credit card purchases made by the Srigleys during the same period. Further

discovery is needed to determine whether any of these credit card purchases were made for a

legitimate business purpose, or if they were also fraudulent transfers (the "**Potentially Avoidable**

---

[2] This is the period commencing approximately three years and four months prior to the Petition Date. To date, Plaintiffs have very limited information relating to the Debtor's financial activity during the period of more than two but less than four years prior to the Petition Date, i.e., between April 28, 2019 and April 28, 2021. Further discovery is needed.

[3] This is the sum of: $357,616.18 in withdrawals or transfers of cash assets; $58,631.99 in credit card purchases, checks and direct purchases from the Debtor's cash accounts; and $40,822.78 relating to the purchase and sale of the M20K Aircraft. Of this sum, approximately $212,615.35 in cash or other value was fraudulently transferred in the two-year period prior to the Petition Date. *See* discussion *infra* in sections B.1, B.2, and C.2 through C.4.

**Transfers**"). The Potentially Avoidable Transfers are listed on the attached **Appendix A-1**.

7. The tactics the Srigleys used to carry out their scheme were varied and several. First, they withdrew cash from the Debtor's cash accounts on a continuous basis, irrespective of the Debtor's solvency at the time. Through at least 73 separate transactions from January 10, 2020 through September 6, 2022, the Srigleys withdrew from or transferred out of the Debtor's accounts, approximately $357,616.18[4] in cash assets. *See* ¶¶ 35-54, *infra* and **Appendix A**.

8. Of these 73 transfers, 58 of them were made in increments of $3,300.00, on an apparently scheduled two-week basis, for a total of $191,400.00. *See* discussion of "Owner Draws" in ¶¶ 39-41. The remaining 15 transfers, totaling $166,216.18, were apparently unscheduled. Of course, as the Debtor was perpetually insolvent, the unscheduled transfers were only made when the Debtor had immediate possession of liquid cash assets. Typically, the Srigleys withdrew cash after the Debtor received large customer deposits. Other times, the Srigleys took out loans in the Debtor's name, in some cases further increasing the entity's indebtedness, then subsequently withdrew portions of the loan proceeds. *See* ¶¶ 51-54, *infra.*

9. The Srigleys also siphoned the Debtor's cash assets for their personal use by using the Debtor's bank and credit accounts for personal purchases. Plaintiffs have identified approximately $58,631.99[5] in expenditures made by the Srigleys that seem to be of a personal nature, such as purchases relating to entertainment, meals, travel, camera and electronics

---

[4] Of this amount, $141,410.38 was withdrawn or transferred in the two-year period prior to the Petition Date.

[5] Of this amount, $30,382.19 were made in the two-year period prior to the Petition Date.

equipment, and apparel, as well as an additional $14,568.47[6] in potentially personal

expenditures. *See infra* ¶¶ 74-80, **Appendix A** and **Appendix A-1**.

10.      Perhaps the most egregious example of these personal expenditures is the

Srigleys' use of the Debtor's assets and accounts to finance and maintain a personal airplane,

specifically a 1981 Mooney M20K '231' (Aircraft Registration Number: N233JB; Serial

Number: 25-0598) (the "**M20K Aircraft**"). From January of 2020 through the sale of the M20K

Aircraft in early 2022, the Srigleys used the Debtor's accounts to pay for not less than

$55,354.35[7] in expenses relating to the airplane. These expenses included, but were not limited

to, the cost of financing, maintaining and insuring the M20K Aircraft, as well as expenses

relating to Mr. Srigley's activity as a pilot. *See infra* ¶¶ 81-86 and **Appendix B**.

11.      Upon information and belief, the Debtor also claimed the full amount of

depreciation allocable to the M20K Aircraft in its 2021 Schedule C, and likely other tax years as

well. *See* ¶¶ 127-129; 133-138, *infra*.

12.      Despite the fact that the Debtor's assets were apparently used to finance the

M20K Aircraft, when it was sold on or about February 22, 2022, upon information and belief, the

Debtor did not receive the $121,837.59 in apparent proceeds from the sale, or even the

$38,736.63 in apparent proceeds net of the payoff amount. Plaintiffs suspect that, instead, the

Srigleys received the full amount of the sale proceeds. See ¶¶ 87-90, *infra*.

13.      Again, despite the fact that the Debtor's assets were used to finance the airplane,

---

[6] Of this amount, $10,217.91 of these purchases were made in the two-year period prior to the filing of the Petition.

[7] Of this amount, $30,691.69 in purchases or other transfers were made in the two-year period prior to the Petition Date.

the Debtor was not the registered owner of the M20K Aircraft. Rather, the Srigleys perpetrated

an additional calculated scheme for the purpose of shielding the airplane from the Debtor's

creditors. They created Srigley Development Company, LLC ("**Srigley Development**

**Company**"), which would be the airplane's registered owner. *See* ¶¶ 82-83, *infra.*

14.    Given the Srigleys' pattern and practice of withdrawing cash and taking out credit,

a reasonable person would assume that the Debtor was either sufficiently profitable to support

such withdrawals and maintain such a level of debt, or that it was so well-capitalized the entity

was able to pay its debts as they came due and the withdrawals could be justified as return of

excess equity. The facts, however, indicate that neither scenario was the case.

15.    The 2020 and 2021 federal tax filings relating to the Debtor, namely its Schedule

Cs, claim a combined net loss of $138,782.00 in those two operating years.[8] The Debtor has not

provided copies of its 2022 tax filings to the Plaintiffs, but according to the Petition, its 2022

revenue was $4,115.80. Its 2022 documented expenses far exceed this figure. *See infra* ¶¶ 48-49.

16.    With respect to the Debtor's known cash assets: as of December 31, 2020, its cash

accounts showed a combined balance of $50,288.13; as of December 31, 2021, the combined

balance was $14,284.56; and as of December 31, 2022, the balance in the Debtor's Bank of

America, N.A. checking account ending in 3252 (the "**Operating Account**" or "**BofA 3252**"),

was a deficit of $11.05.[9] In contrast, the Debtor's known loan and credit liabilities in each of

those years were: $211,669.75 as of December 31, 2020; $118,319.05 as of December 31, 2021;

---

[8] The 2020 Schedule C shows a claimed net loss of $186,875.00 and the 2021 Schedule C shows a
claimed net profit of $48,093.00.

[9] As of December 31, 2022, Plaintiffs believe that the balances in the Debtor's other two cash accounts,
the Bank of America, N.A. checking accounts ending in 6487 and 6490 were at or near $0.00.

and $215,295.43 as of December 31, 2022. *See infra* ¶¶ 45-49.

17.    The Srigleys' scheme continued until they apparently determined that it had reached the point of diminishing returns. In the fall of 2021, when the Debtor was in the midst of renovating the Plaintiffs' home, the Srigleys started taking steps to shut down the Debtor. Their actions continued in earnest once they anticipated arbitration.

18.    In late 2021, the Plaintiffs' renovation was the Debtor's only project with substantial work remaining, but the fact that the Debtor had contractual obligations to satisfy was apparently irrelevant to the Srigleys. So, on or about December 17, 2021, the Srigleys caused the Debtor to wrongfully terminate its contract with the Plaintiffs. The Debtor's wrongful behavior, directed by the Srigleys, set in motion an arbitration action, filed by the Plaintiffs on December 28, 2021 in the American Arbitration Association Construction Industry Tribunal (AAA Case No. 01-21-0018-1548) (the "**Arbitration Action**"). *See infra* ¶¶ 103-04.

19.    Even before the Srigleys caused the Debtor to improperly terminate its contract with the Plaintiffs, they had already begun ceasing the Debtor's business activities. On or about November 19, 2021, the Srigleys caused the Debtor to lay off all of its field crew. According to the Srigleys, between approximately November of 2021 and January of 2022, the Debtor declined to bid on certain home remodeling projects and chose not to begin construction on another. By the end of calendar year 2021 when the arbitration commenced, the Debtor had effectively shut down its business and stopped operating as a residential remodeling contractor altogether. *See* ¶¶ 105-06, *infra*.

7

20.     The Srigleys' instigation of the Debtor's contract breach resulted in an arbitration award and eventual judgment in favor of the Plaintiffs, in the amount of $876,707.21 plus post-judgment interest and costs. *See* ¶104, *infra* and Plaintiffs' Proof of Claim, filed on June 25, 2024. The Debtor has not paid the Plaintiffs any portion of this debt.

21.     Despite the fact that the Debtor was no longer a functioning business but rather in the process of winding down, the Srigleys maximized the Debtor's insolvency, continuing to use its credit cards and take out new loans without regard to the Debtor's ability to pay, incurring new debt of not less than $139,421.36 during the period of approximately December 8, 2021 through November 17, 2022. *See* ¶¶ 117-121, *infra.* They continued to withdraw cash assets from the Debtor's cash accounts, totaling $79,961.89, until the fall of 2022, when there was nothing left to take. *See infra* ¶¶ 96 and 124.

22.     Here again, the Srigleys' behavior was calculated. They used the facade of the Debtor's business to further enrich themselves, and in the process, wasted the Debtor's remaining assets. The staggering cost to the Debtor's creditors did not matter to the Srigleys. They were focused solely on their personal gain, seemingly without concern that their actions were not only unethical, but also fraudulent.

## JURISDICTION AND VENUE

23.     This is an adversary proceeding pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") to, among other things, recover money or property for the estate and avoid and recover fraudulent transfers.

24.     This Court has jurisdiction over the subject matter of this adversary proceeding

pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409, as this adversary proceeding arises under and in connection with a case under Chapter 7 of

Title 11 of the United States Code (the "**Bankruptcy Code**") that is pending in the United States

Bankruptcy Court District of Columbia.

25.     On October 17, 2024, Plaintiffs filed their Motion for Derivative Standing. As of

the date of the filing of this Complaint, the Court has not yet issued an order on the motion and

thus, not yet granted the Plaintiffs derivative standing to bring this action. However, Plaintiffs are

filing this Complaint before the two-year statute of limitations period expires on or about April

28, 2025, to preserve their potential future rights to prosecute the claims described herein should

this Court grant such permission.

## PARTIES

26.     This case arises from the alleged business failure of Touchstone Remodelers, LLC

(the "**Debtor**"), a limited liability company organized under the laws of the District of Columbia,

with a former principal place of business in Montgomery County, Maryland. Its stated business

purpose was residential remodeling. The Debtor was dissolved as an entity in the District of

Columbia on or about November 30, 2022.[10]

27.     On April 28, 2023 (the "**Petition Date**"), the Debtor commenced its Chapter 7

case by filing a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (the

---

[10] Upon information and belief, its ability to do business in Maryland was forfeited by department action
on or about November 20, 2022 and its ability to do business in Virginia was automatically canceled on or
about May 31, 2022 for failure to pay the registration fee.

"**Petition**"), thereby initiating bankruptcy case number 23-116-ELG in the United States

Bankruptcy Court District of Columbia (the "**Case**"). The Debtor's commencement of the Case

as of the Petition Date created an estate as defined pursuant to 11 U.S.C. § 541(a) (the "**Estate**").

William Douglas White was appointed to serve as the Chapter 7 trustee in the Case (the

"**Trustee**").

28.      Upon information and belief, the Debtor was owned by Benjamin Robert Srigley

and Cynthia Tyburczy Srigley.[11] Benjamin Srigley was the Chief Executive Officer and founder

of the Debtor, and at the time the Petition was filed, represented himself as its sole managing

member, officer and authorized representative.[12] In addition to her ownership role, Cynthia

Srigley, the spouse of Benjamin Srigley, held several positions with the Debtor at relevant times

herein: she was the Chief Operations Officer from May of 2021 through the end of December

2021, the Director of Business Development (unofficial) from August of 2019 to May of 2021,

and the Office Manager from December of 2021 to May of 2021.[13] She also appears to be the

signatory on all checks written out of the Debtor's Bank of America, N.A. account ending in

3252 ("**BofA 3252**" or the "**Operating Account**") from approximately February 10, 2021 until

August 3, 2022, the date of the last check written out of that account. Cynthia Srigley's

---

[11] *See* Debtor's Responses to Interrogatory No. 19 and Table 2, Touchstone Remodelers' Response to Interrogatories (AAA Case No. 01-21-0018-1548), dated April 14, 2022 (Exhibit 1 to Plaintiffs' May 31, 2023 Statement to the Trustee), attached in Appendix A to the *Motion for Derivative Standing.*

[12] *See* Petition at Official Form 201, Item 17; Debtor's Resolution; Official Form 202; Official Form 207, Part 14; and List of Creditors and Mailing Matrix. *See also Motion for Entry of an Order Pursuant to Rule 2004 Authorizing Examinations and for the Production of Documents*, filed in this Case on October 18, 2023 (the "**Rule 2004 Motion**") at ¶1.

[13] See Debtor's Responses to Interrogatory No. 19, Touchstone Remodelers' Response to Interrogatories (AAA Case No. 01-21-0018-1548), dated April 14, 2022; screenshot of Cynthia Srigley's bio from the Debtor's former website (Exhibits 1 and 18 to Plaintiffs' May 31, 2023 Statement to the Trustee), attached in Appendix A to the *Motion for Derivative Standing. See also Motion for Derivative Standing* at ¶7.

relationship with the Debtor was not disclosed in the Petition except as the source of compensation paid to the Debtor's attorney.[14]

29.    Besides the Debtor, the Benjamin Srigley and Cynthia Srigley were apparently owners, members and/or officers of another entity, Srigley Development Company, a limited liability company organized under the laws of the State of Maryland. Its stated business purpose was real estate investment and development. Srigley Development Company was dissolved as an entity in Maryland on or about May 2, 2023, several days after the Petition Date.[15] Upon information and belief, Srigley Development Company was an affiliate or subsidiary of the Debtor, or the two entities were otherwise under common ownership and control. The two entities also apparently shared the address at 2214 Distribution Circle, Silver Spring, Maryland 20910. The existence of Srigley Development Company was not disclosed in the Petition.

30.    Plaintiff Federico M. Bandi and Plaintiff Angela M. Bandi, as unsecured judgment creditors of the Debtors, are parties in interest in the Case.

## FACTUAL ALLEGATIONS

### A.    The Debtor Was the Alter Ego of the Srigleys

31.    Benjamin Srigley and Cynthia Srigley, as owners, members, managers and officers of the Debtor, exercised complete day to day operational and financial control of and domination over the entity. They made all decisions relating to the Debtor, owned and controlled

---

[14] *See* Petition at Official From 102, Disclosure of Compensation of Attorney for Debtor(s).

[15] *See* true and correct copy of Srigley Development Company's Articles of Cancellation and related screenshots from Maryland SDAT website, attached in **Appendix C**.

all of its assets, managed all of its financial accounts, and were the sole beneficiaries of any

potential profits.

32.     The Srigleys did not respect the fact that the Debtor owned the business. Rather,

there existed a unity of interest and ownership between the Debtor and the Srigleys such that

there was no real separation between the Debtor's business and the Srigleys' personal financial

affairs.

33.     The Srigleys inadequately capitalized the Debtor; they extensively commingled

assets; they shielded the Debtor's assets from creditors by fraudulently transferring assets to

themselves, directly and indirectly; they did not bother to maintain corporate formalities or deal

with the Debtor at arm's length, as they viewed the Debtor as an extension of themselves. The

Srigleys took all of these actions for their sole personal financial benefit. The Debtor, and its

associated status as a limited liability company, was just a sham used by the Srigleys to disguise

their fraudulent or otherwise wrongful conduct.

34.     The Srigleys' actions were not without harm to either the Debtor or to third

parties. They abused the LLC form of the Debtor to an unjust outcome, damaging the Debtor to

the point of insolvency, and consequently causing substantial financial injury to the Debtor's

creditors.

**B.      The Srigleys Did Not Adequately Capitalize the Debtor**

35.     With respect to the relevant timeframe herein, the Srigleys did not adequately

capitalize the Debtor. They siphoned its assets, so that it never had sufficient funds to

functionally operate as a separate entity. Upon information and belief, the Srigleys engaged in a

12

pattern and practice of alternately looting the Debtor, then returning funds to it only as immediately necessary to assist with the entity's cash flow and keep the business running.

36.     From early January 2020 through the Petition Date, the Srigleys caused the Debtor to transfer or withdraw from its cash accounts, a total of not less than $357,616.18: $141,410.38 of this amount was transferred or withdrawn during the two-year period prior to the Petition Date, the remaining $216,205.80 was transferred or withdrawn between January of 2020 and April of 2021, within the four-year period prior to the Petition Date. *See* **Appendix A**. These transfers were made or withdrawals taken in three forms:

> (1)   scheduled cash transfers from the Operating Account to a Bank of America, N.A. checking account ending in 6857 (the "**Owner Draw Account**"),[16] which, upon information and belief, was not an account owned or controlled by the Debtor;

> (2)   unscheduled cash transfers from the Debtor's cash accounts to accounts apparently not owned or controlled by the Debtor, including the Owner Draw Account and a Bank of America, N.A. savings account ending in 6378 ("**Non-Debtor BofA Account 6378**" or "**BofA 6378**");[17] and

> (3)   occasional ATM or teller cash withdrawals.

37.     Among other factors discussed *infra*, the Srigleys caused the Debtor to make these transfers or take these withdrawals when the Debtor was insolvent and these withdrawals and transfers were fraudulent transfers.

---

[16] *See* ¶ 39, *infra*.

[17] Upon information and belief, in addition to the Operating Account disclosed in the Petition, the Debtor owned or controlled two other cash accounts: a Bank of America, N.A. savings account ending in 6487 ("**BofA 6487**"), and a Bank of America, N.A. checking account ending in 6490 ("**BofA 6490**"). With respect to the accounts apparently not owned or controlled by the Debtor, Plaintiffs believe that the Owner Draw Account and BofA 6378 were owned or controlled by either Benjamin Srigley, Cynthia Srigley or jointly by the Srigleys.

38.     Upon information and belief, as a result of the Srigleys' causing the Debtor to

fraudulently transfer its cash assets to themselves during the period from early January 2020

through the Petition Date, funds totaling $357,616.18 are not available for distribution to

Debtor's unsecured creditors, including the Plaintiffs.

### 1.     The Debtor's Scheduled Cash Transfers to the Srigleys

39.     On a regular basis, the Srigleys caused the Debtor to transfer funds in $3,300.00

increments (the "**Owner Draws**"), from the Operating Account to the Owner Draw Account.[18] In

both calendar years 2020 and 2021, these transfers were made every two weeks, for a total of 26

payments of $3,300.00, or $85,800.00, in each calendar year. In calendar year 2022, six

payments of $3,300.00 each were made, for a total of $19,800.00. *See* **Appendix A**.

40.     From January 2020 to the Petition Date, the Srigleys caused the Debtor to transfer

a total of $191,400.00 in Owner Draws. Of this amount, $79,200.00 was transferred in the two-

year period prior to the Petition Date. *See* **Appendix A**.

41.     The Srigleys seem to have taken these Owner Draws irrespective of their existing

equity in the Debtor and despite the Debtor's poor financial health, or rather state of

insolvency.[19] Upon information and belief, the Debtor was not sufficiently capitalized to justify

---

[18] The terms "Owner Draws" and "Owner's Distributions" is nomenclature used in documents produced
by the Debtor in connection with the Arbitration Action discussed herein at ¶¶ 103-104. In the Petition,
the Debtor uses the phrase "Member Draw." *See* Petition at Official Form 207, Part 13, Item 30. As
Plaintiffs do not yet know who owns or controls the Owner Draw Account, and thus, who received the
transferred assets, the use of the term "the Srigleys" is intended to refer to Benjamin Srigley individually,
Cynthia Srigley individually, and to the Srigleys jointly.

[19] However, according to a report received from the Debtor in connection with the Arbitration Action
which appears to show cash assets in the form of "Owner's Distributions" transferred from the Operating
Account into the Owner Draw Account, as of December 24, 2021, the balance on the Owner Draw
Account was $984,466.00. *See* Touchstone Remodelers Account QuickReport January - December 2021
(Exhibit 9 to Plaintiffs' May 31, 2023 Statement to the Trustee), attached in Appendix A to the *Motion for
Derivative Standing*.

these draws.

42.    The Srigleys' behavior persisted until the end of April 2022, several months after the Debtor had stopped doing business as a residential remodeling company and receiving revenue altogether. In other words, the Srigleys only stopped taking cash assets out of the Debtor once there was nothing left to take.

43.    While Plaintiffs do not yet have all of the documents needed to analyze the complete financial picture of the Debtor on any given date, we can point to certain general factors which demonstrate the Debtor's consistently poor financial health.

44.    With respect to its profitability in calendar year 2020, the 2020 Schedule C relating to the Debtor and filed with the Srigleys' federal income tax returns,[20] evidences a claimed net loss of $186,875.00. Yet, the Srigleys took $85,800.00 in Owner Draws in 2020.

45.    As of December 31, 2020, the combined balance of the Operating Account, BofA 6487, and BofA 6490 (collectively, the "**Debtor's Known Cash Accounts**") was $50,288.13. In contrast, the Debtor's 2020 end-of-year liabilities due to its loan and credit card debt and outstanding checks were 4.2 times the value of its cash assets: $211,669.75.[21]

46.    In calendar year 2021, the Debtor's Schedule C shows a claimed net profit of $48,093.00. This claimed net income is 56% of the $85,800.00 the Srigleys took as Owner Draws in 2021.

---

[20] Upon information and belief, the Debtor was a pass-through entity whose tax filing obligations were indicated on Schedule C of the Srigleys' tax returns.

[21] As of December 31, 2020, the balance on each known credit or loan account was as follows: $106,331.85 (AmEx 02002); $66,683.95 (BofA 7078); and $15,834.68 (BofA 9400). As of December 31, 2020, there were $22,819.27 in outstanding checks written on the Operating Account.

47.     At the end of December 2021, the combined balance of the Debtor's Known Cash Accounts was $14,284.56. On the other hand, the Debtor's 2021 end-of-year loan and credit liabilities were $118,319.05,[22] more than eight times the value of its cash assets.

48.     The Debtor's financial picture only worsened in 2022. Plaintiffs have not received a copy of the Debtor's 2022 Schedule C, and are thus not certain whether the Debtor claimed a net profit or a net loss in that year. That said, in its Petition, the Debtor stated that its gross revenue in 2022 was $4,115.80. Upon information and belief, its 2022 expenses far exceeded this amount. Still, the Srigleys took $19,800.00 in Owner Draws in 2022, or 4.8 times the Debtor's claimed 2022 revenue.

49.     As of December 31, 2022, the remaining balance in the Operating Account was an $11.05 deficit, and the Debtor's loan and credit liabilities were $215,295.43.[23] In addition, the Debtor owed to the Plaintiffs, an arbitration award in the amount of $876,707.21, plus post-judgment interest and costs.[24]

50.     Upon information and belief, as a result of the Srigleys' inducement of the Debtor to fraudulently transfer its cash assets to themselves in the form of Owner Draws during the period from early January of 2020 through the Petition Date, funds totaling $191,400.00 are not available for distribution to Debtor's unsecured creditors, including the Plaintiffs.

---

[22] As of December 31, 2021, the balance on each known credit or loan account was as follows: $79,673.80 (AmEx 02002); $14,978.84 (AmEx 11008); $17,076.04 (BofA 7078); -$320.61 (BofA 9400); and $6,910.98 (Capital One 8764).

[23] As of December 31, 2022, the balance on each known credit or loan account was as follows: $89,490.25 (AmEx 02002); $21,578.67 (AmEx 11008); $74,105.48 (BofA 7078); $19,721.43 (BofA 9400); and $10,399.60 (Capital One 8764).

[24] *See infra* ¶ 104.

2.   **The Debtor's Unscheduled Cash Withdrawals and Transfers to the Srigleys**

51.     In addition to the Owner Draws discussed in section B.1 *supra*, from time to time,

the Srigleys also caused the Debtor to make other transfers out of the Operating Account or out

of BofA 6490 and into accounts presumably owned by the Srigleys, namely the Owner Draw

Account and Non-Debtor BofA Account 6378, and to make occasional ATM or other cash

withdrawals. Consistent with the manner in which they handled Owner Draws, the Srigleys

caused the Debtor to make these transfers and take these withdrawals with complete and total

disregard of the Debtor's insolvency at the time.

52.     As evidenced in Table 1 *infra*, between early 2020 and the Petition Date, the

Srigleys caused the Debtor to make 15 separate, unexplained transfers or withdrawals out of the

Debtor's Known Cash Accounts, totaling $166,216.18.[25] *See* Table 1, *infra* and **Appendix A**.

This figure does not include four additional ATM withdrawals totaling $1,111.90, made during

the same period, described as "Contractor Labor" or "Day Labor" in documents received to date,

but otherwise uncorroborated.[26]

53.     With respect to the larger transfers described in Table 1, the timing of all but one

seems to coincide with the Debtor's receipt of substantial cash assets from third parties. These

are the transfers ranging from $5,000.00 to $40,000.00, made on or about March 12, 2020,

March 26, 2020, February 16, 2021, April 19, 2021, January 24, 2022 and February 10, 2022.

---

[25] Of the $166,216.18 in transferred cash assets, $62,210.38 was transferred during the two-year period prior to the Petition Date.

[26] The withdrawals are: $403.50 on April 5, 2021, $403.50 on April 8, 2021, $102.00 on April 21, 2021, and $202.90 on August 27, 2021. Further discovery is needed to determine whether any of these ATM withdrawals should be included as Avoidable Transfers.

| TABLE 1 - UNSCHEDULED CASH WITHDRAWALS | | | | |
|---|---|---|---|---|
| **Date** | **Originating Account** | **Receiving Account** | **Amount** | **Deposit Activity in Operating Account Prior to Transfer** |
| February 25, 2020 | Operating Account | Cash Withdrawal | $1,500.00 | |
| March 12, 2020 | Operating Account | BofA 6378 | $20,000.00 | $81,570.00 QuickBooks deposit received on March 11, 2020 |
| March 26, 2020 | Operating Account | BofA 6378 | $30,000.00 | $83,999.50 QuickBooks deposit received on March 26, 2020 |
| September 30, 2020 | Operating Account | Cash Withdrawal | $202.90 | |
| January 22, 2021 | Operating Account | Cash Withdrawal | $202.90 | |
| January 28, 2021 | Operating Account | Cash Withdrawal | $500.00 | |
| February 16, 2021 | Operating Account | Owner Draw Account | $20,000.00 | $71,951.00 in Cares Act PPP loan proceeds and $47,028.00 QuickBooks deposit received on February 1, 2021; $20,100.00 in pre-encoded deposits received on February 10, 2021. |
| February 18, 2021 | Operating Account | Cash Withdrawal | $800.00 | |
| March 3, 2021 | Operating Account | Cash Withdrawal | $800.00 | |
| April 19, 2021 | BofA 6490 | Owner Draw Account | $30,000.00 | $280,000.00 wire transfer received from Plaintiffs into BofA 6490 on March 19, 2021 |
| May 19, 2021 | Operating Account | "Customer Withdrawal Image" | $11,945.52 | |
| December 8, 2021 | Operating Account | Cash Withdrawal | $4,400.00* | $38,468.00 QuickBooks deposit received on November 30, 2021. |
| January 24, 2022 | Operating Account | BofA 6378 | $40,000.00** | $10,000.00 line of credit loan proceeds from BofA 7078 (CRD 0346) received on January 11, 2022; $45,000.00 line of credit loan proceeds from BofA 7078 (CRD 0346) received on January 21, 2022 |
| February 10, 2022 | Operating Account | Owner Draw Account | $5,000.00 | $18,500.00 in pre-encoded deposits received on February 9, 2022 |
| September 6, 2022 | Operating Account | Owner Draw Account | $864.86 | $864.86 was the remaining balance of the Operating Account as of September 6, 2022. |
| **TOTAL:** | | | **$166,216.18** | |

\* In a report reconciling transactions in the Operating Account for the period ending December 31, 2021, apparently prepared by RY CPA, LLC, the Debtor's former accountant and/or bookkeeper (*see* Petition at Official Form 207, Part 13, Item 26), this $4,400.00 withdrawal is described as an "Expense" and the Payee is recorded as "Ben Srigley." *See* true and correct copy of Reconciliation Report for Touchstone Remodelers BOA Platinum Checking (3252), Period Ending 12/31/2021 (dated January 19, 2022), attached in **Appendix C**.

\*\* In a report reconciling transactions in the Operating Account for the period ending January 31, 2022, apparently prepared by RY CPA, LLC, this $40,000.00 transfer is described as an "Expense" and the Payee is recorded as "Ben Srigley." *See* true and correct copy of Reconciliation Report for Touchstone Remodelers BOA Platinum Checking (3252), Period Ending 1/31/2022 (dated February 10, 2022), attached in **Appendix C**.

54.     Upon information and belief, as a result of the Srigleys causing the Debtor to fraudulently transfer its cash assets to themselves in the form of unscheduled transfers made and withdrawals taken during the period from early January of 2020 through the Petition Date, funds totaling $166,216.18 are not available for distribution to Debtor's unsecured creditors, including the Plaintiffs.

### 3.     The Srigleys Caused the Debtor to Obtain Loans for the Purpose of Enriching Themselves

55.     To counter their gross undercapitalization of the Debtor, the Srigleys caused the Debtor to obtain loans from third parties. During the period relevant to this Complaint, these loans came from two sources: (1) the United States government, in the form of U.S. Small Business Administration Paycheck Protection Program loans (the "**PPP Loans**"), the proceeds of which are described in account statements as "Cares Act Paycheck Protection Program Deposit[s]"; and (2) Bank of America, N.A., specifically from account ending in 7078, described in account statements as a "Bank of America Business Advantage Credit Line" ("**BofA 7078 Loans**"), the proceeds of which are described in account statements as "Online Banking advance[s] from CRD 0346."

56.     Upon information and belief, during the period from January 2020 through the

Petition Date, the Debtor received combined loan proceeds of $315,392.23. *See* Tables 2 and 3

*infra.*

57.     As detailed in Table 2, below, the Debtor apparently received combined proceeds

of $119.471.00 from two separate PPP Loans. According to information received to date, these

loans were ultimately forgiven.[27]

| TABLE 2 - PPP LOANS | | |
|---|---|---|
| **Date Proceeds Received** | **Receiving Account** | **Amount** |
| May 4, 2020 | Operating Account | $47,520.00 |
| February 1, 2021 | Operating Account | $71,951.00 |
| **Total:** | | **$119,471.00** |

58.     Upon information and belief, during the period from January 2020 through the

Petition Date, the Debtor received combined proceeds (or advances) from eight separate BofA

7078 Loans totaling $195,921.23. *See* Table 3, below.

| TABLE 3 - BofA 7078 LOANS | | |
|---|---|---|
| **Date Proceeds Received** | **Receiving Account** | **Amount** |
| April 2, 2020 | Operating Account | $30,000.00 |
| May 1, 2020 | Operating Account | $45,000.00 |
| September 17, 2021 | Operating Account | $30,000.00 |
| October 5, 2021 | Operating Account | $15,000.00 |
| December 17, 2021 | Operating Account | $17,076.04 |

---

[27] Whether the PPP Loans were properly obtained by the Srigleys on behalf of the Debtor and/or whether the Debtor properly met the conditions of loan forgiveness is beyond the scope of this Complaint.

| January 11, 2022 | Operating Account | $10,000.00 |
| January 21, 2022 | Operating Account | $45,000.00 |
| June 7, 2022 | Operating Account | $3,845.19* |
| **Total:** | | **$195,921.23** |

\* This deposit was described as "Overdraft Protection," to cover an apparent $3,845.19 overdraft in the Operating Account existing as of June 6, 2022.

59.     With respect to the BofA 7078 Loan proceeds of $17,076.04 the Debtor received on or about December 17, 2021, upon information and belief, they were used to pay off the December 17, 2021 existing balance of $17,076.04 on the Debtor's BofA 9400 credit card account. In other words, it seems that the Srigleys caused the Debtor to take out a loan from Bank of America, N.A. to repay Bank of America, N.A.

60.     As the BofA 7078 Loan account was described as a "Business Advantage Credit Line, the terms of the Debtor's agreement with Bank of America, N.A. may have mandated that the BofA 7078 Loans were to be used solely for business purposes.[28]

61.     However, based upon information received to date, Plaintiffs believe that the Srigleys used at least some of these loan proceeds to enrich themselves rather than using them in furtherance of the Debtor's business. In particular, of the $45,000.00 in BofA 7078 Loan proceeds apparently received by the Debtor into the Operating Account on or about January 21, 2022, $40,000.00 was transferred out of the Operating Account and into Non-Debtor BofA Account 6378 just three days later. *See* Table 1 and ¶¶ 51-54, *supra*.

---

[28] Further discovery is needed to make this determination.

62.     Upon information and belief, absent the $45,000.00 BofA 7078 Loan, the Debtor would not have had sufficient cash assets in the Operating Account to permit the $40,000.00 withdrawal made on January 24, 2022. The ledger balance in the Operating Account immediately prior to receipt of the $45,000.00 BofA 7078 Loan, that of January 18, 2022, was $15,134.16. Of this $15,134.16 balance, $10,000.00 were the proceeds of the BofA 7078 Loan taken on or about January 11, 2022 and $4,115.80 was the full amount of the Debtor's 2022 gross revenue as reported in the Petition. Moreover, at the time of the Srigleys' $40,000.00 withdrawal, the Debtor could not have been anticipating any receivables of substance.[29]

63.     As discussed *infra* in ¶¶ 74-80, the Srigleys also relied heavily on the use of credit cards to keep the Debtor's business going and allow them to continue to use the Debtor to obtain value for their personal benefit and enjoyment. In the Petition, the Debtor reported claims of $213,883.48 in unpaid credit card and loan debt alone. *See* Petition at Schedule E/F, items 3.2-3.5 and 3.7.

64.     Had the Srigleys not continued to improperly strip the Debtor of its cash assets, some (or all) of these loans may not have been necessary. This same argument applies to the Srigleys' extensive use of credit cards to support the Debtor's business.

65.     The impact of the BofA 7078 Loans as well as the Debtor's unfettered use of credit cards, all at the Srigleys' direction, was not neutral to the Debtor. Rather, the Srigleys'

---

[29] With respect to additional receivables, between January 11, 2022 and February 28, 2022, six other deposits totaling $24,600.00 were received into the Operating Account. Of this amount, the $500.00 pre-encoded deposit seems to be a client payment (this amount is not included in the $4,115.80 in 2022 revenue); two pre-encoded deposits of $14,800.00 and $3,700.00 were likely from the sale of the Isuzu Truck; two Zelle transfers of $300.00 each were likely from the sale of "Project Tools" to third parties and the $5,000.00 transfer from the Owner Draw Account was apparently for the purchase of "Project Tools" from the Debtor by the Srigleys. *See infra* ¶¶ 106-110.

actions caused substantial harm to the Debtor by creating indebtedness that was beyond the

Debtor's ability to pay.

66.     Moreover, the Srigleys' poor management of the Debtor's credit and loan

accounts caused the Debtor to frequently pay less than the full balances due, to not make

payments in a timely manner, or to not make payments at all. Upon information and belief, this

behavior resulted in the Debtor incurring finance charges and late fees of not less than

$48,714.67[30] during the period from January 2020 through the Petition Date, further deepening

the Debtor's insolvency.

### C.     The Srigleys Commingled Assets

67.     As part of their undercapitalization scheme, the Srigleys shuttled funds back and

forth between Debtor-owned accounts and accounts which were not owned by the Debtor,

namely the Owner Draw Account and Non-Debtor BofA Account 6378 (which were presumably

the Srigleys' personal accounts),[31] commingling their assets with those of the Debtor. The

Srigleys used the Debtor's assets to support their lifestyle, paying for personal meals,

entertainment and travel, and making purchases for personal items such as video camera

equipment, electronics and apparel, all with the Debtor's credit cards and cash accounts. The

most egregious example of this is the Srigleys' siphoning of the Debtor's assets to finance a

recreational plane and pay for its associated expenses and maintenance. *See* discussion of the

M20K Aircraft *infra* in ¶¶ 81-86.

---

[30] Finance charges and late fees were incurred on each credit and loan account as follows: (1) AmEx 02002 - $23,956.17; (2) AmEx 11008 - $7,723.16; (3) BofA 7078 Loans - $7,547.19; (4) BofA 9400 - $6,001.31; and (5) Capital One 8764 - $3,486.84.

[31] *See supra* ¶ 36.

1. **The Srigleys shuttled funds back and forth between the Debtor's accounts and their personal accounts**

68. Upon information and belief, the Srigleys kept the Debtor so perpetually undercapitalized, that when the Debtor lacked sufficient funds to pay its immediate debts and was unable to obtain cash from third party sources, the Srigleys' pattern and practice was to return to the Operating Account a portion of the Debtor's cash assets they had previously withdrawn, in an amount sufficient to satisfy the Debtor's debts at the time. *See* Table 4 *infra.*

69. This behavior continued until the Srigleys apparently decided the Debtor no longer served them and they walked away, shutting down the business completely and leaving the Debtor's creditors holding the bag. The date of their last transfer into the Operating Account was July 27, 2022, which roughly coincides with the conclusion of the Debtor's arbitration proceedings with the Plaintiffs in the summer of 2022. *See* ¶¶ 102-113, *infra.*

| | | | | TABLE 4 |
|---|---|---|---|---|
| Date | Originating Account | Receiving Account | Amount | Operating Account Balance and Known Payables around Time of Transfer |
| January 7, 2020 | BofA 6378 | Operating Account | $30,000.00 | • $18,337.68 ledger balance as of January 6, 2020<br>• $37,186.76 in apparent outstanding checks† as of January 7, 2020<br>• $8,397.97 in payroll†† and Owner Draws disbursed on January 10, 2020<br>• **$30,000.00 transferred to BofA 6378 from the Operating Account on or about March 26, 2020.** *See* Table 1, *supra.* |
| March 4, 2020 | BofA 6378 | Operating Account | $20,000.00 | • $11,329.63 ledger balance as of March 3, 2020<br>• $19,466.53 in apparent outstanding checks as of March 6, 2020<br>• $8,223.29 in payroll and Owner Draws disbursed on March 6, 2020<br>• **$20,000.00 transferred to BofA 6378 from the Operating Account on or about March 12, 2020.** *See* Table 1, *supra.* |

24

| August 3, 2020 | BofA 6378 | Operating Account | $30,000.00 | • $45,455.14 ledger balance as of August 1, 2020<br>• $6,255.19 in apparent outstanding checks as of August 3, 2020<br>• $11,070.94 in payroll and Owner Draws disbursed on August 7, 2020<br>• $25,824.75 in loan and credit payments made between August 3 and August 6, 2020 |
|---|---|---|---|---|
| November 4, 2020 | BofA 6378 | Operating Account | $30,000.00 | • $12,252.61 ledger balance as of November 3, 2020<br>• $1,000.00 in apparent outstanding checks as of November 4, 2020<br>• $5,043.77 payment to IRS on November 4, 2020<br>• $7,016.99 in credit payments made on or about November 6, 2020 |
| December 2, 2020 | BofA 6378 | Operating Account | $30,000.00 | • $9,384.54 ledger balance as of December 1, 2020<br>• $3,099.84 in apparent outstanding checks as of December 2, 2020<br>• $14,285.56 in credit payments made on or about December 7, 2020<br>• **$30,000.00 transferred to the Owner Draw Account from BofA 6490 on or about April 19, 2021.** *See* **Table 1,** *supra*. |
| January 25, 2021* | Owner Draw Account | Operating Account | $20,000.00 | • $7,130.07 ledger balance as of January 22, 2021<br>• $3,021.46 in apparent outstanding checks as of January 30, 2021<br>• $6,832.93 in payroll and Owner Draws disbursed on January 22 and 25, 2021<br>• $1,000.00 loan payment made on or about January 28, 2021<br>• **$20,000.00 transferred to the Owner Draw Account from the Operating Account on or about February 16, 2021.** *See* **Table 1,** *supra*. |
| March 3, 2022* | Owner Draw Account | Operating Account | $5,000.00 | • $5,373.05 ledger balance as of March 2, 2022<br>• $1,560.05 in payroll disbursed on March 4, 2022<br>• $4,753.00 in credit payments made on or about March 7, 2022<br>• **$5,000.00 transferred to the Owner Draw Account from the Operating Account on or about February 10, 2022.** *See* **Table 1,** *supra*. |
| March 18, 2022* | Owner Draw Account | Operating Account | $20,000.00 | • $2,911.70 ledger balance as of March 15, 2022<br>• $4,860.05 in payroll and Owner Draws disbursed on March 18 and March 21, 2022<br>• $4,937.15 in remaining expenses paid from March 21 through March 29, 2022<br>• **Upon information and belief, this $20,000.00 may be cash "returned to Touchstone for the original amount deposited on the airplane (i.e., $5k on 8/30/17 and $19k on 9/5/17)."**<br>• **$40,000.00 transferred to BofA 6378 from the Operating Account on or about January 24, 2022.** *See* **Table 1,** *supra*. |

| | | | | |
|---|---|---|---|---|
| March 18, 2022* | Owner Draw Account | Operating Account | $5,000.00 | • $2,911.70 ledger balance as of March 15, 2022<br>• $4,860.05 in payroll and Owner Draws disbursed on March 18 and March 21, 2022<br>• $4,937.15 in remaining expenses paid between March 21 and March 29, 2022<br>• **Upon information and belief, this $5,000.00 may be cash "returned to Touchstone for the original amount deposited on the airplane (i.e., $5k on 8/30/17 and $19k on 9/5/17)."** |
| April 28, 2022* | Owner Draw Account | Operating Account | $10,000.00 | • $2,119.54 ledger balance as of April 25, 2022<br>• $4,860.05 in payroll and Owner Draws disbursed on April 29, 2022 |
| May 5, 2022* | Owner Draw Account | Operating Account | $5,000.00 | • $4,184.01 ledger balance as of May 4, 2022<br>• $1,560.05 in payroll was disbursed on May 13, 2022<br>• $5,677.18 in loan and credit payments made on or about May 6, 2022 |
| May 26, 2022* | Owner Draw Account | Operating Account | $5,000.00 | • $1,641.76 ledger balance as of May 23, 2022<br>• $1,560.05 in payroll was disbursed on May 27, 2022<br>•  $1,233.85 in tax and credit payments made between May 26 and May 31, 2022 |
| June 7, 2022* | Owner Draw Account | Operating Account | $10,000.00 | • -$3,845.19 ledger balance as of June 6, 2022 (this overdraft was apparently covered by a BofA 7078 Loan)<br>• $3,120.10 in payroll was disbursed on June 10 and June 24, 2022<br>• $2,316.13 in remaining expenses were paid between June 7 and June 30, 2022 |
| July 5, 2022* | Owner Draw Account | Operating Account | $8,000.00 | • $1,574.15 ledger balance as of July 1, 2022<br>• $8,966.35 in tax payments, credit payments and miscellaneous expenses made between July 6 and July 26, 2022 |
| July 27, 2022* | Owner Draw Account | Operating Account | $5,000.00 | • $607.80 ledger balance as of July 26, 2022<br>• $4,613.03 in expenses paid in August of 2022 |
| | | | **$233,000.00** | |

† The term "outstanding checks" refers to checks that had been written and issued on the Operating Account, but not yet cashed or deposited and cleared.
†† The term "payroll" refers to expenses described in the Debtor's Operating Account statements as "DES: PAYROLL." It does not include associated payroll tax payments.
* WIth respect to transfers made in 2021 and 2022, the Debtor's ability to obtain loans from its BofA 7078 line of credit was severely limited or non-existent. Further discovery is needed for dates prior to 2021. As of January 25, 2021, the balance on BofA 7078 was $66,956.37. Between March 3, 2022 and July 27, 2022, the balance on BofA 7078 ranged from $69,493.53 to $73,766.24. The account credit limit was $75,000.00.

70.    Between January 2020 and September 2022, including Owner Draws, the Srigleys moved cash into and out of the Debtor on approximately 88 separate occasions. *See* Tables 1 and 4 and ¶¶ 39 and 52, *supra*.

71.    During the Arbitration Action, on or about July 1, 2022, the Srigleys were apparently prepared to move cash assets to the Debtor in amount sufficient to allow the Debtor to purchase the Plaintiffs' home in Northwest Washington, DC. As of this date, the Operating Account balance was $1,574.15 and the Debtor's credit card and loan debt was approximately $203,659.55.[32]

72.    According to the document entitled "Touchstone Remodelers LLC's Damages," submitted by the Srigleys in connection with the Arbitration Action:

> Alternate Resolution: Touchstone Remodelers is putting forward an alternate resolution to AAA Case No. 01-21-0018-1548. The Bandi Residence project still requires significant design work and many months ahead of construction. The Bandis mentioned that they are in a "permanent solution" regarding their housing arrangement. ***Therefore, Touchstone would like to make a cash offer on the property,*** which would allow the Bandis to walk away from the property and the stress associated with completing the project. To do so, Touchstone would require a inspection to confirm conditions of the property (based on 11/1/21 status), and engagement with an attorney for negotiations related to property acquisition.[33]

73.    If on July 1, 2022, the Srigleys were ready to return cash, or otherwise make a cash contribution, to the Debtor to purchase the Plaintiffs' home, why were they unwilling to use

---

[32] This is the sum of the following account balances as of July 1, 2022: AmEx 02002 - $83,045.08; AmEx 11008 - $18,040.52; BofA 7078 - $73,338.72; BofA 9400 - $19,303.98; and Capital One 8764 - $9,931.25.

[33] *See* Touchstone Remodelers LLC's Damages (AAA Case No. 01-21-0018-1548) dated July 1, 2022, attached in **Appendix C** (emphasis added).

that cash to satisfy the debt owed to the Debtor's creditors?[34]

### 2.   The Srigleys Used the Debtor's Assets for Personal Purposes

74.      The Srigleys commingled assets in another notable way as well: by using the

Debtor's assets to purchase items for their personal benefit. Most frequently, they used the

Debtor's credit card accounts to achieve this goal. Other times, the Srigleys made personal

purchases directly through the Operating Account, using checks or online bill payment services.

With respect to the latter situation, most of these purchases related to the M20K Aircraft.

75.      Upon information and belief, the relevant credit card accounts were business

accounts owned by the Debtor and not the Srigleys' personal accounts.[35] These accounts, all of

which relate to debts owed to unsecured creditors of the Debtor and which are listed in the

Petition (collectively the "**Business Card Accounts**"), are:

(1)   the American Express "Business Platinum Card"[36] account ending in 02002
("**AmEx 02002**");
(2)   the American Express "Amazon Business Prime Card" account ending in
11008 ("**AmEx 11008**");
(3)   the "Bank of America Business Advantage" Mastercard account ending in
9400 ("**BofA 9400**"); and
(4)   the Capital One Spark Business "Spark Cash Select credit card | Visa
Signature Business" account ending in 8764 ("**Capital One 8764**").

76.      The use of these Business Card Accounts for personal rather than business

expenses may have been in direct violation of the agreements between the credit card issuer and

---

[34] Based on third party sources such as Zillow, as of July 1, 2022, the market value of the Plaintiffs' home
exceeded the total of $1,102,001.10 in creditors' claims declared in the Petition.

[35] According to the Petition at Official Form 206H, item 2, Benjamin Srigley was a codebtor on these
accounts.

[36] The card name descriptions are as they appear on the relevant account statements.

the Debtor, some or all of which may have included a provision restricting use of the cards to business purposes.[37]

77.    Between January of 2020 and the Petition Date, upon information and belief, the Srigleys used the Business Card Accounts or the Operating Account to make expenditures of not less than $58,631.99[38] that seem to be of a personal nature, including but not limited to, purchases relating to entertainment, meals, travel, camera equipment, electronics, apparel, and the M20K Aircraft. *See* **Appendix A** for a list of individual transactions.

78.    Of the $58,631.99 in personal expenditures, $9,932.17 of them were made in 2022 alone, after the Debtor had stopped operating as a residential remodeling company altogether. *See infra* ¶¶ 102-113. The latter amount is more than 2.4 times the Debtor's 2022 gross revenue of $4,115.80, as reported in the Petition.

79.    The figure of $58,631.99 does not include an additional $14,568.47 in credit card purchases made using the Business Card Accounts during the period from January 2020 and the Petition Date for which further discovery is needed to determine which of these purchases were personal and which were made for a legitimate business purpose (the "**Potentially Avoidable Transfers**").[39] *See* **Appendix A-1** for a list of individual transactions.

80.    Upon information and belief, any and all payments that were made to the issuing banks for charges incurred using these Business Card Accounts were made from the Operating

---

[37] Further discovery is needed to make this determination.

[38] Of this amount, $30,382.19 were made during the two-year period prior to the Petition Date.

[39] Absent further discovery, it is impossible to determine the specific items purchased or to ascertain the purpose for which these purchases were made. Of the Potentially Avoidable Transfers, $10,217.91 of these purchases were made in the two-year period prior to the Petition Date and $1,145.64 were made in 2022 alone.

Account. As a result of the Srigleys causing the Debtor to fraudulently transfer its cash assets in the form of value received for the Srigleys' personal purchases during the period from early January of 2020 through the Petition Date, funds of up to $73,200.46[40] are not available for distribution to Debtor's unsecured creditors, including the Plaintiffs.

### 3.  The Srigley's Used the Debtor's Funds to Finance and Maintain the M20K Aircraft

81.     Of the $58,631.99 in personal expenditures discussed in section C.2, *supra*, the Srigleys used the Debtor's assets to pay not less than $43,408.83 in loan payments and miscellaneous expenses for their recreational airplane, the M20K Aircraft. An additional $11,945.52 was withdrawn directly from the Operating Account, apparently for "M20K Repair & Maintenance," for a total of $55,354.35[41] in expenditures relating to the M20K Aircraft during the period from January 2020 through the Petition Date. *See* **Appendix B**.

82.     Even though the M20K Aircraft was their personal airplane, and although its registered owner was apparently Srigley Development Company,[42] the Srigleys have treated the M20K Aircraft as an asset of the Debtor, most likely since its purchase in late August or early September of 2017, and demonstrably during the period between January 2020 and the Petition Date. Upon information and belief, the Debtor's cash assets were used to make the initial

---

[40] This is the sum of $58,631.99 in Avoidable Transfers and $14,568.47 in Potentially Avoidable Transfers.

[41] Of this amount, $30,691.69 in expenditures were made during the two-year period prior to the Petition Date.

[42] *See* true and correct copy of Aircraft Purchase/Sales Agreement and Aircraft Bill of Sale, dated February 22, 2022, attached in **Appendix C**.

purchase deposits of the M20K Aircraft, totaling approximately $24,000.00.[43]

83.    The remaining purchase price of the aircraft was apparently financed through an agreement between Srigley Development Company and US Aircraft Finance (the "**M20K Loan**").[44] Despite the fact that Srigley Development Company was listed as the borrower on the loan statements, it was the Debtor's assets which were used to pay the M20K Loan. *See* **Appendix B**.

84.    Of the $55,354.35 in Debtor assets spent on the M20K Aircraft from January of 2020 through its sale in early 2022, M20K Loan payments represent $16,175.75 of this amount. Upon information and belief, from January 2020 through December 2021, (25) payments of $647.03 each were made out of the Operating Account to US Aircraft Finance.[45] *See* **Appendix B**.

85.    In addition to financing the M20K Aircraft, during the period from January of 2020 through the sale of the M20K Aircraft in early 2022, approximately $39,178.60 of the Debtor's assets were used to pay for expenses relating to the airplane. Upon information and belief, these expenses included, but were not limited to, $17,672.02 in hangar space/aircraft

---

[43] Upon information and belief, the Debtor's assets were used to make the initial purchase deposits for the M20K Aircraft, in the approximate amounts of $5,000.00 on or about August 30, 2017 and $19,000.00 on or about September 5, 2017. *See* true and correct copy of Correspondence from Cynthia Srigley to Kerry [A. Weaver], received from RY CPA, LLC, [dated on or about March 25, 2022], attached in **Appendix C**.

[44] *See* true and correct copy of US Aircraft Finance Borrower Statement of Account (Account No. C17501), dated January 4, 2022, attached in **Appendix C.**

[45] As the Debtor apparently paid every monthly installment on the M20K Loan from the period of January 2020 through the Petition Date, Plaintiffs strongly believe that the Debtor also paid every other monthly installment from the purchase date (as well as all of the associated costs of the airplane). Assuming that (26) installment payments of $647.03 each were made during the period of October 2017 through December 2019, an additional $16,822.78 would have been paid by the Debtor on the M20K Loan. Adding this figure to the initial deposits of approximately $24,000.00 and the confirmed installment payments of $16,175.75, the Debtor likely paid a total of $56,998.53 on the M20K Loan.

storage expenses,[46] $12,358.33 in repair and maintenance expenses, $4,520.00 in insurance costs,

and $4,628.25 in fuel costs and miscellaneous expenses, as well as expenses relating to Benjamin

Srigley's activities as a pilot. *See* **Appendix B**.

86.    Upon information and belief, the $17,672.02 in purchases related to storing the

M20K Aircraft were made using a Synchrony Bank account ending in 1267, described as a

"Phillips 66® Aviation Card" ("**Phillips 66 Account**"). According to statements, the apparent

owner of the Phillips 66 Account was Benjamin R. Srigley. However, it was the Debtor who paid

the balances on the Phillips 66 Account through the Operating Account. *See* **Appendix B**.

### 4.    The Debtor Did Not Receive the Sale Proceeds of the M20K Aircraft

87.    Despite the fact that the Debtor's cash assets were used to finance the M20K

Aircraft, it appears that the Debtor did not receive the proceeds from its sale. Upon information

and belief, on or about February 22, 2022, the M20K Aircraft was sold for a purchase price of

$121,837.59.[47] Srigley Development Company was listed as the seller. According to the sale

documents, the proceeds were apparently paid in the following forms:

> (1)    a wire transfer in the amount of $25,030.00 (made on or about February 22, 2022); and
>
> (2)    a check in the amount of $96,807.59 (Check 0099 N233JB LLC).

None of the statements of the Debtor's Known Cash Accounts evidence receipt of either a

$25,030.00 wire transfer or a $96,807.59 deposit in February of 2022, in calendar year 2022 or at

---

[46] Upon information and belief, the Srigleys rented hangar space for the M20K Aircraft from DC Metro Aviation Services, located at Montgomery County Airpark in Gaithersburg, MD. Its website shows monthly rates for hangar and tie-down space ranging from $115.00 to $614.00. The figure of $614.00 corresponds with regular payments made through the Operating Account to Synchrony Bank. *See* true and correct screenshot of DC Metro Aviation Services website, attached in **Appendix C**; **Appendix B**.

[47] *See* true and correct copy of Aircraft Purchase/Sales Agreement, attached in **Appendix C**.

any time thereafter. Plaintiffs believe that, instead, the Srigleys received the $121,837.59 in

proceeds.

88.    As discussed *supra in* ¶¶ 83-84, the M20K Aircraft was encumbered by a loan,

payments of which were made using the Debtor's cash assets. *See* **Appendix B**.

89.    On or about January 25, 2022 (the "**Payoff Date**"), the M20K Loan was

apparently paid off by a wire transfer in the approximate amount of $83,100.96.[48] According to

the Debtor's January 2022 account statements, the originating account from which this wire

transfer was made does not appear to be any of the Debtor's Known Cash Accounts.

90.    The January 2022 statement for the Operating Account does show, however, that

on January 21, 2022, the Debtor obtained proceeds of $45,000.00 from a BofA 7078 Loan. It

further indicates that, on January 24, 2022, the day prior to the Payoff Date, the Srigleys caused

the Debtor to transfer $40,000.00 out of the Operating Account into Non-Debtor BofA Account

6378, likely owned by the Srigleys. *See* Tables 1 and 3 *supra*.

91.    Upon information and belief, the Debtor, whose assets were fraudulently

transferred by the Srigleys to purchase and finance the M20K Aircraft and to pay for its related

expenses, is the de facto owner of the airplane. As such, the portion of the sale proceeds which

represent the cost to the Debtor of the purchase and financing of the M20K Aircraft, likely

$56,998.53, should be made part of the Estate, offset as appropriate by any amount not paid for

with the Debtor's assets and by the $16,175.75 in M20K Loan payments already included as

Avoidable Transfers, for a total amount of $40,822.78. *See* **Appendices A** and **B**; ¶ 84 and

---

[48] *See* true and correct copy of US Aircraft Finance Borrower Statement of Account (Account No.
C17501), dated January 25, 2022, attached in **Appendix C**.

footnote 45, *supra*. As a result of the Srigleys causing the Debtor to fraudulently transfer its cash

assets to purchase and finance the M20K Aircraft for the Srigleys' personal use and enjoyment,

funds of approximately $40,822.78 are not available for distribution to Debtor's unsecured

creditors, including the Plaintiffs.

### D.    The Debtor Failed to Maintain Corporate Formalities

92.    As indicated by the behavior described throughout this Complaint, the Debtor

failed to observe proper corporate formalities and did not deal at arm's length with either Srigley

Development Company or with the Srigleys personally.

93.    Moreover, it seems that the Debtor did not keep virtually any business records, or

that it did not properly maintain its records. At the outset of the Case, the Debtor should have

surrendered to the Trustee "all property of the estate and any recorded information, including

books, documents, records, and papers, relating to property of the estate." *See* 11 U.S.C. § 521(a)

(4). However, based on Plaintiffs' personal experience during the § 341(a) meeting process as

well as the representations of the Trustee, the Debtor turned over very little information relating

to its 11-year old business.[49] Of course, it is also possible that the Debtor just refused to comply

with section 521(a)(4) of the Bankruptcy Code.

### E.    The Srigleys Used the LLC Form of the Debtor to Perpetrate Fraud and/or to Achieve an Unjust Result

94.    The Srigleys used the Debtor in various ways to potentially commit financial

fraud or otherwise engage in wrongdoing. As such, the limited liability protection should not

apply. The balance of the Srigleys' personal cash accounts (as well as any other cash or non-cash

---

[49] Plaintiffs' understanding during the September 8, 2023 § 341(a) meeting was that 73 pages of documents were initially turned over to the Trustee.

assets), up to the amount of creditor claims for which proofs of claim have been properly filed in this Case, should be made property of the Estate.

95.     Based upon information obtained to date and our personal experience with the Debtor and with the Srigleys, Plaintiffs believe that the Srigleys engaged in a pattern and practice of withdrawing, transferring, usurping and/or wasting the cash assets of the Debtor, that they maximized the debt obligations of the Debtor to increase the availability of cash assets or other value, and that they maintained the Debtor in a perpetually undercapitalized state. The Srigleys behavior was intentional. They did all of this so that they could walk away from the Debtor's business at any time, maximizing their personal gain and leaving nothing for the Debtor's creditors. And so they did.

96.     As discussed in sections B.1 and 2, *supra*, and E.2 and 3, *infra*, the Srigleys fraudulently transferred assets in various forms, from the Debtor to themselves, to shield those assets from creditors of the Debtor. This occurred while the Debtor was engaged in business operations as a residential remodeling contractor as well as thereafter. From approximately December 8, 2021 through November 17, 2022, during the time the Srigleys were winding down the Debtor, they incurred not less than $139,421.36[50] in additional debt on the Debtor's behalf, in the form of bank loans and other credit, for which the Debtor had no means to pay. They caused the Debtor to fraudulently transfer $79,961.89 from the Operating Account and into likely personal accounts or otherwise use it for their personal benefit.

---

[50] This amount is the sum of $26,913.05 (AmEx 02002); $5,544.46 (AmEx 11008); $75,921.23 (BofA 7078 Loans); $5,771.34 (finance charges on BofA 7078 Loans); $21,226.20 (BofA 9400); and $4,045.08 (Capital One 6784). The figure of $139,421.36 does not include finance charges and fees associated with the additional debt incurred on the AmEx02002, AmEx 11008, BofA 9400 and Capita One 6784 accounts.

97.     Both while the Debtor was still operating as a business, while its operations were being shut down by the Srigleys and possibly thereafter, Plaintiffs believe the Srigleys used the Debtor to improperly claim in their tax filings certain of their personal expenses as deductible business expenses, including but not limited to depreciation expense deductions.

98.     In its Petition and during the administration of this Case, the Debtor, at the direction of the Srigleys, as well as Benjamin Srigley directly, may have made false or misleading statements in, or omitted material information from, the Petition or in his testimony during the § 341(a) meetings. Again at the direction of the Srigleys, the Debtor apparently did not properly turn over its business records to the Trustee, nor produce relevant business records requested during the § 341(a) meeting process, and the Debtor refused to respond to the Plaintiffs' Rule 2004 subpoena.

99.     Even the addresses provided in the Petition for the Debtor and for Benjamin Srigley are apparently no longer valid. However, to date, the Srigleys have not provided current contact information for either the Debtor or for Benjamin Srigley. The Debtor and the Srigleys took, or failed to take, all of these actions for the purpose of concealing assets and information in this Case. *See* Motion for Derivative Standing at ¶ 17.

100.    Creditors were harmed as a result of these actions. The Plaintiffs, who did business with the Debtor, are left with an unpaid court judgment. A number of other creditors who did business with the Debtor are left with unpaid bills.

101.    It should be emphasized, however, that the existing evidence is not limited to the fact that creditors of the Debtor will not get paid. Rather, evidence exists that the LLC of the

Debtor was used to potentially perpetrate fraud and to accomplish other wrongful purposes. The

Court should correct this injustice by finding that the Debtor is the alter ego of the Srigleys and

piercing the veil.

**1.      The Srigleys Intentionally Shut Down the Debtor's Business to Avoid Paying Its Creditors**

102.    As discussed *supra* in ¶¶ 39-73, the Srigleys' pattern and practice of withdrawing

and replacing funds continued until they were ready to walk away. Plaintiffs believe the Srigleys

started taking steps to shut down the Debtor in the late summer to early fall of 2021, when the

Debtor was in the midst of renovating the Plaintiffs' home, and continued in earnest once the

Srigleys anticipated arbitration.

103.    On March 17, 2021, the Debtor and the Plaintiffs entered into a contract, whereby

Debtor agreed to perform renovation work on Plaintiffs' home (the "**Contract**"). Despite its

contractual obligations to the contrary, on or before November 1, 2021, the Debtor improperly

stopped work on the Plaintiffs' residential renovation project, and on December 17, 2021, the

Debtor wrongfully terminated the Contract altogether.

104.    On December 28, 2021, Plaintiffs commenced the Arbitration Action against the

Debtor.[51] In June of 2022, a hearing was held in connection with the Arbitration Action, and the

arbitrator entered the final award on September 2, 2022, finding in favor of Plaintiffs on their

claims and against Debtor on its counterclaims, and awarding Plaintiffs the sum of $852,503.52

plus post-judgment interest and an additional amount of $24,203.69 for administrative fees, for a

combined total of $876,707.21 (the "**Arbitration Award**"). Or about March 10, 2023, the

---

[51] On or about January 19, 2022, the Debtor filed its answer and counterclaim.

Arbitration Award was confirmed as a judgment in the Superior Court of the District of Columbia ("**Judgment**").[52]

105.     However, on or about November 19, 2021, even before improperly terminating its contract with the Plaintiffs, the Debtor apparently laid off all of its field crew,[53] effectively leaving it with no means to perform the duties of its renovation business. Around the same time, the Debtor also apparently halted its business development activities and stopped looking for new clients. In the Srigleys' own words, during the period from November 1, 2021 to December 17, 2021, the Debtor declined to bid on certain new home remodeling projects and, on or about January 21, 2022, allegedly chose not to begin construction on a home remodeling project for which it was the "DCRA contractor on record."[54] By the end of calendar year 2021, the Debtor was effectively no longer operating as a residential remodeling contractor.

106.     In early 2022, the Srigleys started winding down the Debtor's operations, apparently canceling certain of its business insurance policies and selling its assets or de facto assets such as vehicles, equipment, and tools. In March of 2022, they described the Debtor as "non-operational while going through arbitration" and stated that, at that time, the Debtor was

---

[52] The Petition is inaccurate in that it describes the Arbitration Award Confirmation Action as pending, when, in fact, it had concluded prior to the filing of the Petition. *See* Amended Order of Judgment (Case No. 2022 CAB 005162, filed in the Superior Court of the District of Columbia, dated March 10, 2023) attached as an exhibit to Plaintiffs' Proof of Claim, filed on June 25, 2024.

[53] *See* Debtor's Responses to Interrogatory Nos. 3, 13, 14 and Table 2, Touchstone Remodelers' Response to Interrogatories (AAA Case No. 01-21-0018-1548), dated April 14, 2022; Debtor's 2021 quarterly Form 941 filings (Exhibits 1 and 10 to Plaintiffs' May 31, 2023 Statement to the Trustee), attached in Appendix A to the *Motion for Derivative Standing. See also* Touchstone Remodelers payroll details reports for January 7, 2022 and January 21, 2022, both dated February 6, 2022, attached in **Appendix C**.

[54] *See* Appendix IX, Item 9 to the Debtor's Defense and Counterclaim (AAA Case No. 01-21-0018-1548) dated February 2, 2022; s*ee also* Debtor's Response to Interrogatory No. 4, Touchstone Remodelers' Response to Interrogatories (AAA Case No. 01-21-0018-1548), dated April 14, 2022 (Exhibits 1 and 6 to Plaintiffs' May 31, 2023 Statement to the Trustee), attached in Appendix A to the *Motion for Derivative Standing.*

not making any effort to replace either the field employees it had laid off in November or its

Chief Operations Officer, Cynthia Srigley.[55]

107.    Upon information and belief, on or about February 8, 2022, the Debtor sold a

2004 Isuzu NPR dump truck ("**Isuzu Truck**") of which it was the apparent owner, for

$18,500.00.[56]

108.    On or about February 9, 2022, two Zelle transfers of $300.00 each were

apparently made from an Edwin Zeballos into the Operating Account. Upon information and

belief, these two $300.00 payments were allegedly for the purchase of "Project Tools" from the

Debtor.[57]

109.    As discussed *supra* in ¶ 87, on or about February 22, 2022, the Srigleys sold the

M20K aircraft.

110.    On or about February 23, 2022, the Srigleys transferred $5,000.00 from the

Owner Draw Account into the Operating Account, which may have been for the Srigleys'

purchase of "Project Tools" from the Debtor.[58]

111.    On or about March 8, 2022, a Zelle transfer in the amount of $55.00 was

---

[55] The Debtor further stated that Cynthia Srigley had left her Chief Operations Officer position at the end of 2021 and returned to her previous career as a Research Chemist for the Food and Drug Administration. *See* Debtor's response 38g to Document Request No. 38, Touchstone Remodelers' Production of Requested Documents (AAA Case No. 01-21-0018-1548) dated March 23, 2022 (Exhibit 2 to Plaintiffs' May 31, 2023 Statement to the Trustee), attached in Appendix A to the *Motion for Derivative Standing.*

[56] Plaintiffs first became aware of the Isuzu Truck's existence at the Initial § 341(a) Meeting; it was not disclosed in the Petition. *See* Vehicle Bill of Sale, dated February 8, 2022, attached in **Appendix C**.

[57] *See* true and correct copies of Open Items List as of 2-15-2022 - Amount Received_CS and Correspondence between Cynthia Srigley, Kerry A. Weaver and Antoine Haserjian, received from RY CPA, LLC, dated March 8 through March 11, [2022], both attached in **Appendix C**.

[58]*See* true and correct copy of Open Items List as of 03-01-2022 - Amount Received_CS and Correspondence between Cynthia Srigley, Kerry A. Weaver and Antoine Haserjian, received from RY CPA, LLC, dated March 8 through March 11, [2022], both attached in **Appendix C**.

apparently made from a Carlos Samper into the Operating Account. Upon information and belief, this $55.00 was for the purchase of "Office Equipment" from the Debtor.[59]

112.    At some point in March or April of 2022, it appears that the Srigleys may have caused the Debtor to cancel certain of its business insurance policies. On or about April 8, 2022, two pre-encoded deposits of $646.00 and $213.10 with the references "Erie Insurance" and "Builder FirstSource, Inc." were made into the Operating Account. The $213.10 deposit was described as "a premium refund for canceling our Erie umbrella insurance policy." A pre-encoded deposit of $252.45 made into the Operating Account on or about March 28, 2022 was referenced as "Builders Mutual."[60]

113.    Also in the spring of 2022, the Srigleys failed to timely file the Debtor's required biennial report with the District of Columbia Department of Licensing and Consumer Protection ("**DLCP**"), leading the DLCP to apparently revoke the Debtor's ability to do business in the District of Columbia. On or about November 30, 2022, the Debtor was administratively dissolved in the District of Columbia. The Debtor did not notify the Plaintiffs, its largest creditor, of its dissolution. Five months later, on April 28, 2023, the Debtor filed its Petition.

### 2.    The Debtor, at the Direction of the Srigleys, Fraudulently Incurred Additional Debt While Insolvent and While Winding Down Its Business and Facing Arbitration

114.    By the end of 2021, the Debtor had stopped operating as a remodeling business,

---

[59] See true and correct copy of Open Items List as of 03-09-2022 - Amount Received_CS, attached in **Appendix C.**

[60] See true and correct copy of Correspondence between Cynthia Srigley and Kerry A. Weaver, received from RY CPA, LLC, relating to 04-08-2022 Deposit - Builders FirstSource, Inc. - BOA Platinum Checking (3252) - $213.10, attached in **Appendix C.** Builders Mutual Insurance Company is also listed as a creditor with an unsecured claim of $6,675.21 at item 3.6 in Schedule E/F of the Petition.

was effectively no longer receiving revenue,[61] and did not apparently have the means or the

intention to obtain new work. The Debtor was also facing an Arbitration Action and a very real

risk of associated loss.

115.    During the period from late 2021 through mid-2022, the Srigleys knew full well

that the Debtor had no means with which to pay its current debts as they came due, let alone

future debts.

116.    As of December 31, 2021, the combined balance of the Debtor's Known Cash

Accounts was only $14,284.56; the Debtor's credit card and loan debt was $118,319.05. The

Debtor was insolvent and had been for some time. *See* ¶¶ 43-49, *supra*.

117.    Yet, despite the Debtor's state of insolvency, the fact that it had terminated its

business activities, and the risk of a sizable arbitration loss, the Srigleys willfully and

fraudulently caused the Debtor to incur not less than $139,421.36 in new debt during the period

of December 8, 2021 through November 17, 2022. This debt includes $75,921.23 in BofA 7078

Loans, $5,771.34 in finance charges and late fees on the BofA 7078 Loans, and $57,728.79 in

credit card charges on the Business Card Accounts.

118.    The Srigleys caused the Debtor to obtain four additional BofA 7078 Loans

between December of 2021 and June of 2022: (1) a loan in the amount of $17,076.04, on or

about December 17, 2021, the very same date the Debtor notified the Plaintiffs that it was

terminating the Contract;[62] (2) a loan in the amount of $10,000.00 on or about January 11, 2022;

---

[61] The Debtor stated in the Petition that its 2022 gross revenue was $4,115.80. A deposit for this amount
was received in the Operating Account on or about January 11, 2022.

[62] *See supra* ¶ 59.

(3) a loan in the amount of $45,000.00 on or about January 21, 2022;[63] and (4) a loan in the amount of $3,845.19 on or about June 6, 2022, described as an "Overdraft Advance." The $75,921.23 in combined proceeds of these loans were received in the Operating Account. *See* section B.3. and Table 3, *supra*.

119.    The Srigleys caused the Debtor to pay only the minimum amount due on the $75,921.23 in BofA Loans, for a total of $6,497.00 in payments, until on or about July 21, 2022, after which time the Debtor apparently made no further payments. As a result of this payment practice, during 2022 and 2023, the Srigleys caused the Debtor to incur not less than $5,771.34 in finance charges and late fees on the BofA 7078 Loans.

120.    Also, the Srigleys willfully and intentionally harmed the Debtor by continuing to make purchases using its credit card accounts, knowing the Debtor did not have the means to repay the debt. The Srigleys caused the Debtor to incur a total of approximately $57,728.79 in new debt from purchases[64] made during the period of December 8, 2021 through November 17, 2022, as indicated below:

| | |
|---|---|
| (1) AmEx 02002: | $26,913.05 |
| (2) AmEx 11008: | $5,544.46 |
| (3) BofA 9400: | $21,226.20 |
| (4) Capital One 8764: | $4,045.08 |

121.    The figure of $57,728.79 does not include the additional debt incurred due to the associated finance charges and fees relating solely to those purchases. However, total finance charges and late payment fees incurred by the Debtor on the balances of the Business Card

---

[63] *See supra* ¶ 90.

[64] This new debt is net of related credits for such purchases.

Accounts during the period from January 2022 through April 2023 were $26,983.29, allocated as

follows:

| | |
|---|---|
| (1) AmEx 02002: | $14,998.93 |
| (2) AmEx 11008: | $5,944.95 |
| (3) BofA 9400: | $3,480.98 |
| (4) Capital One 8764: | $2,558.43 |

122.    Upon information and belief, the Srigleys engaged in the above-described

behavior with no intention of satisfying the Debtor's financial obligations and with a willful and

reckless disregard for the harm it would cause to the Debtor and to the Debtor's existing and

future creditors. The Srigleys just let the debts of the Debtor pile up, intending to use the

Debtor's LLC as a shield to protect themselves from personal liability.

### 3.    The Debtor, at the Direction of the Srigleys, Fradulently Transferred Assets While Shutting Down Its Business and Arbitrating

123.    Even after the Debtor had stopped doing business as a residential remodeling

contractor, apparently had had no new signed contracts and thus no future work, no anticipated

revenue of substance, was already substantially in debt, had no means of paying its existing

obligations let alone new debt, and was facing a substantial arbitration loss, the Srigleys

continued their practice of causing the Debtor to transfer cash assets out of the Operating

Account.

124.    From December 2021 through September 2022, the Srigleys caused the Debtor

withdraw as cash and/or transfer out of the Operating Account and into accounts which were

presumably their personal accounts, or otherwise transfer for their personal use, a combined total

of $79,961.89.[65] *See supra* sections B.1 and 2.

### 4. The Srigleys May Have Used the Debtor's Business to Engage in Tax Improprieties to Benefit Themselves

125. The Srigleys may have used the Debtor's business improperly to claim as

deductible business expenses in their tax filings certain of their personal expenses. Upon

information and belief, this behavior occurred both while the Debtor was operating as a business,

while its operations were being shut down by the Srigleys, and possibly after the Debtor was

dissolved.

126. In particular, the level of the Debtor's depreciation and section 179 expense

deductions claimed by the Srigleys in the Debtor's 2020 and 2021 Schedule Cs seems

extraordinarily high given the Debtor's claimed lack of non-cash assets. Apart from $5,000.00 in

miscellaneous tools allegedly left in the Debtor's former warehouse space,[66] Benjamin Srigley

stated in the Petition that the Debtor did not own or lease any real or personal property, such as

machinery, equipment, vehicles, office furniture, fixtures, or inventory, in other words, that the

Debtor did not own or lease any apparently depreciable property.

127. Yet, in the 2020 and 2021 Schedule Cs of the Debtor, the Srigleys claimed

---

[65] This is the sum of $50,264.86 in unscheduled cash withdrawals, $26,400 in Owner Draws and $3,297.03 in purchases relating to the M20K Aircraft paid directly from the Operating Account from December 8, 2021 through September 6, 2022 *See* **Appendix A**. During that same period, the Srigleys also transferred approximately $73,000.00 cash assets into the Debtor. *See supra* ¶¶ 68-73. Plaintiffs maintain that these were assets belonging to the Debtor, which the Srigleys had previously transferred out of or withdrawn from the Debtor's cash accounts despite their lack of existing equity in the Debtor.

[66] In its response to Item 50 of the Petition, the Debtor stated that it was unclear of these items were "legally abandoned."

depreciation expense deductions of $32,931.00 and $66,857.00, respectively.[67]

128.    Despite requesting this information multiple times, the Plaintiffs have not received from the Debtor, or from any other party, any supporting documentation for the information contained or referenced in its 2020 and 2021 Schedule Cs, including but not limited to IRS Form 4652 (Depreciation and Amortization), and Statements 3, 4 and 5 referenced in the 2021 Schedule C. As such, Plaintiffs are not able to fully determine which property was the subject of the depreciation expense deductions claimed by the Debtor or to understand the magnitude of the deductions given the claimed lack of depreciable property.

129.    Upon information and belief, a portion of these claimed deductions likely related to the M20K Aircraft. *See* ¶¶ 81-91, *supra.* For calendar year 2021, depreciation expenses relating to the M20K Aircraft in the amount of $9,632.00[68] were apparently recorded in the Debtor's books. Prior to 2021, depreciation expenses for the M20K Aircraft seem to have been recorded as follows: $2,666.67 in 2017; $8,000.00 in 2018; $8,000.00 in 2019; and $8,000.00 in 2020.[69] These figures seem to represent the full amount of depreciation expense deductions claimed for the M20K Aircraft in total.

130.    Upon information and belief, a portion of the depreciation expenses reported in the 2020 and 2021 Schedule Cs also likely related to the Isuzu Truck. It seems that

---

[67] To date, the Debtor has refused to provide a copy of its 2022 Schedule C.

[68] *See* true and correct copy of Fixed Asset Rollforward Worksheet - Updated 02-07-2022, attached in **Appendix C**.

[69] *See* true and correct copy of Fixed Asset True up Entries Worksheet as of 12-31-2020, attached in **Appendix C**.

approximately $2,600.00 in 2020 and $749.00 in 2021 were recorded as depreciation deduction expenses in the Debtor's books.[70] *See supra* ¶ 107.

131.    During the §341(a) meetings, Benjamin Srigley revealed the existence of a 2021 Dodge Ram pickup truck (the "**Ram Truck**"). The Debtor later produced a title to this vehicle, which was dated December 9, 2021 and which listed Benjamin Srigley as the registered owner.[71] Based on his testimony, the full amount of allowable depreciation expenses relating to the Ram Truck may have been included in the Debtor's 2021 Schedule C, however, Plaintiffs have not been able to independently verify whether this is the case.

132.    Assuming the figures in ¶¶ 129-130 are accurate, the remaining depreciation and section 179 expense deductions claimed by the Srigleys in the Debtor's Schedule Cs are $22,331.00 in 2020, and $56,476.00 in 2021. It seems that the Debtor's accountant may have re-recorded or reclassified certain fixed assets in 2021, which may provide an explanation. However, absent further discovery, Plaintiffs are unable to accurately account for the remaining amounts.

133.    Tax reporting relating to the M20K Aircraft may be additionally problematic. Upon information and belief, it was the Debtor who apparently claimed the full amount of the airplane's deductions on its Schedule C, however, the M20K Aircraft was not owned by the Debtor, but by Srigley Development Company.[72] *See supra* ¶ 82.

---

[70] *See* true and correct copy of Fixed Asset True up Entries Worksheet as of 12-31-2020 and Fixed Asset Rollforward Worksheet - Updated 02-07-2022, attached in **Appendix C**.

[71] *See* true and correct copy of Maryland Certificate of Title to 2021 Dodge Ram pickup truck, attached in **Appendix C**.

[72] Plaintiffs do not know if Srigley Development Company was the subject of a separate Schedule C filed with the Srigleys' tax returns.

134.    More importantly, to date, the Plaintiffs have seen no evidence establishing that the M20K Aircraft was used for any business purpose of any kind, let alone the Debtor's business. To the contrary, upon information and belief, the M20K Aircraft was used solely for the Srigleys' personal enjoyment.

135.    In that regard, Mr. Srigley has presented himself to the public as a recreational pilot and as the owner of a Mooney aircraft. His bio from the Debtor's former website provides in pertinent part:

> Ben also has a passion for precision flying. He holds an instrument-rated, multiengine commercial pilot's license and *on weekends he enjoys flying his four-seat Mooney* or even an acrobatic plane on occasion.

(emphasis added).[73]

136.    Further discovery is needed to ascertain whether Srigley Development Company engaged in any business activity whatsoever, and if so, what relationship existed between the business's alleged purpose of real estate investment and development and the use and ownership of the M20K Aircraft. Additional discovery is also needed to determine whether Srigley Development Company received any revenue, had its own accounts, or was operated as an entity separate and distinct from the Debtor or from the Srigleys.

137.    If instead, as Plaintiffs strongly suspect, Srigley Development Company was not an active business, but was simply a shell company devised to hold the M20K Aircraft, it may have served a dual purpose for the Srigleys:

---

[73] *See* true and correct copy of Screenshot of Benjamin Srigley's Bio from Touchstone's Former Website, (Exhibit 15 to Plaintiffs' May 31, 2023 Statement to the Trustee), attached in Appendix A to the *Motion for Derivative Standing.*

(1) it allowed them to claim their recreational airplane as a business expense for tax purposes, making them the recipients of tax benefits they would not otherwise have received;[74] and

(2) it enabled them to shield the airplane (and the proceeds of the M20K Aircraft's eventual sale) from present and future creditors of the Debtor.

138.    Similarly, if the Srigleys claimed any other non-business related expenses as business expenses on the Debtor's Schedule Cs, such as those relating to maintaining and insuring the M20K Aircraft, expenses relating to Mr. Srigley's activity as a pilot, or any other of their personal expenditures made using the Debtor's cash assets or accounts, this practice would also have resulted in potentially decreasing the Srigleys' personal tax liability.

139.    Additional discovery is required to determine whether potential tax implications associated with the Srigleys' behavior warrant further investigation.

### 5.      The Srigleys May Have Intentionally Concealed Assets and Information During this Case

140.    Notice in the Case was provided on Official Form 309C and no proof of claim deadline was initially set.[75] In Schedule A/B of the Petition, the Debtor disclosed cash assets of $0.00, claiming ownership of or control over a single account, the Operating Account. Discovery in connection with the Plaintiffs' Rule 2004 Motion revealed that the Debtor owned at least two additional accounts with Bank of America, N.A.: BofA 6487 and BofA 6490 (the balances of both of these accounts as of the Petition Date were likely $0.00).

---

[74] As the Debtor was a pass-through entity, the Srigleys would have been the direct beneficiaries of claimed depreciation expense deductions on the Debtor's Schedule Cs, which would likely have had the effect of reducing their tax liability.

[75] Creditors were subsequently notified of possible dividends and a proof a claim date was set for July 1, 2024.

141.   Also in Schedule A/B, the Debtor claimed that it had no interest in any other

assets, except in response to Items 10 and 11, which referenced $0.00 in "Unknown" accounts

receivable, and in response to Item 50, which referred to the alleged existence of $5,000.00 in

tools which may have been "legally abandoned" by the Debtor.

142.   In addition, among other items, none of the following were disclosed in the

Petition:

(1) the fact that the Debtor likely had (or had within the two years prior to the
    Petition Date) another owner, member and manager, Cynthia Srigley;
(2) the existence of Srigley Development Company and its common ownership with
    the Debtor;
(3) the existence of the M20K Aircraft and its relationship to the Debtor;
(4) the amount of the Debtor's assets used to purchase and finance the M20K
    Aircraft and pay for its associated expenses;
(5) the M20K Aircraft's related sale and the amount of the proceeds;
(6) the identity of the individual(s) or entity who received the M20K Aircraft
    proceeds; and
(7) the location of the M20K Aircraft proceeds as of the Petition Date.

*See, e.g.*, the Debtor's negative responses to Items 13, 25 and 31 in Official Form 207 of the

Petition.

143.   Plaintiffs believe that the Srigleys, acting for the Debtor, intentionally attempted

to conceal this information from the Trustee and, consequently, from this Court. As discussed in

detail in Plaintiffs' Motion for Derivative Standing, we informed the Trustee immediately of our

concerns in two separate writings provided to him at the commencement of the Case. *See id.* at

¶¶ 3-5.

144.   Again at the direction of the Srigleys, the Debtor has scoffed at the bankruptcy

process altogether. The Debtor did not provide certain business records to the Trustee, which

should have been kept in the ordinary course of business. *See* section D, *supra*. It is not clear

whether the Debtor just did not maintain the records, whether they were willfully destroyed, or

whether they were concealed from the Trustee and its creditors.

145.    As discussed in detail in Plaintiffs' Rule 2004 Motion, over a period of more than

five months from the commencement of the Case and upon the urging of the Plaintiffs, the

Trustee continued to request certain documents from the Debtor relating to its acts, conduct,

property, liabilities and financial condition. The Debtor has refused to produce most of the

requested documents, which are undoubtedly in its possession, custody and control, and has

continued to refuse to produce these documents even in response to the Rule 2004 subpoena

issued by the Plaintiffs pursuant to this Court's January 25, 2024 order. *See also* Motion for

Derivative Standing, at ¶¶ 9-15.

146.    The Debtor is not even willing to maintain current contact information, including

a valid address, throughout this proceeding. *See supra* ¶ 99.

147.    Further, the Srigleys concealed the Debtor's assets by fraudulently transferring

not less than $457,070.95 in cash or other value during at the period from January 2020 through

the Petition Date. *See* **Appendix A**.

148.    Of course, all of this behavior is consistent with the Srigleys' scheme, which is to

make it as difficult as possible for others to hold the Debtor, and them personally, responsible

under the law. To date, they have largely succeeded.

## COUNT ONE [I]

**(Avoidance of Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code
Against Benjamin Srigley, Cynthia Srigley and Srigley Development Company)**

149.     Plaintiffs re-allege and incorporate herein by reference the allegations contained
in the preceding paragraphs as if set forth in their entirety.

150.     The Avoidable Transfers, as detailed on **Appendix A,** were transfers of interest of
the Debtor in property or obligations incurred by the Debtor.

151.     The Avoidable Transfers were made or incurred on or within two (2) years prior to
the Petition Date.

152.     The Avoidable Transfers were made with actual intent of the Defendants to
hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that
such transfer was made or such obligation was incurred, indebted.

153.     Benjamin Srigley, Cynthia Srigley and Srigley Development Company were not
good faith transferees or obligees, and therefore are not entitled to offset rights under section
548(c) of the Bankruptcy Code and applicable non-bankruptcy law.

154.     Each Avoidable Transfer was accompanied by at least three badges of fraud
indicating the fraudulent nature of such transfer, including but not limited to the following:

>    (i)   the transfers made or obligations incurred were to, or for the benefit of,
>          Benjamin Srigley, Cynthia Srigley and/or the Srigleys jointly, insiders of the
>          Debtor,[76] who exercised dominion and control over the Debtor;
>
>    (ii)  the transfers made or obligations incurred were to, or for the benefit of,
>          Srigley Development Company, an entity under common ownership or
>          control with the Debtor;

---

[76] *See* 11 § U.S.C. 101(31).

(iii) the transfers were made or obligations were incurred at the same time (or shortly before or after) new liabilities and debts were being incurred by the Debtor;

(iv) the Debtor was or became insolvent at the time of the Avoidable Transfers (or shortly thereafter); and

(v) before or at the time the transfer was made or obligation was incurred, there was an arbitration action pending against the Debtor, or the imminent threat of such arbitration action.

155.   As a result of the Avoidable Transfers, creditors of the Debtor sustained significant damages.

156.   The Avoidable Transfers are avoidable as fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code.

157.   The Plaintiffs reserve the right to seek the avoidance and recovery of any and all additional avoidable transfers that they later discover.

158.   The Avoidable Transfers are recoverable jointly and individually from Benjamin Srigley and Cynthia Srigleys as alter egos of the Debtor and of Srigley Development Company.

159.   The Plaintiffs are entitled to recover, for the benefit of the Estate, the full amount of the Avoidable Transfers, totaling not less than $212,615.35, to be distributed to the Debtor's unsecured creditors as appropriate under the provisions of the Bankruptcy Code.

160.   The Plaintiffs are entitled to their reasonable costs, and all other relief the Court deems just and proper for their efforts to avoid and recover these fraudulent transfers.

## COUNT TWO [II]

**(Avoidance of Fraudulent Transfers Under Section 548(a)(1)(B) of the Bankruptcy Code Against Benjamin Srigley, Cynthia Srigley and Srigley Development Company)**

161.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

162.    The Avoidable Transfers, as detailed on **Appendix A**, were transfers of interest of the Debtor in property or obligations incurred by the Debtor.

163.    The Avoidable Transfers were made or incurred on or within two (2) years prior to the Petition Date.

164.    The Debtor did not receive reasonably equivalent value in exchange for the Avoidable Transfers.

165.    The Debtor was insolvent on the dates of each of the Avoidable Transfers, or became insolvent as a result of the Avoidable Transfers.

166.    At the time of, or as a result of the Avoidable Transfers, the Debtor was engaged in a business or transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

167.    At the time of the Avoidable Transfers, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

168.    The transfers made or obligations incurred were to, or for the benefit of, Benjamin Srigley, Cynthia Srigley, and/or the Srigleys jointly, insiders of the Debtor, who exercised dominion and control over the Debtor, or to Srigley Development Company, an entity under common ownership or control with the Debtor.

169.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of Bankruptcy Code section 502.

170.    The Avoidable Transfers are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

171.    The Plaintiffs reserve the right to seek the avoidance and recovery of any and all additional avoidable transfers that they later discover.

172.    The Avoidable Transfers are recoverable jointly and individually from Benjamin Srigley and Cynthia Srigleys as alter egos of the Debtor and of Srigley Development Company.

173.    The Plaintiffs are entitled to recover, for the benefit of the Estate, the full amount of the Avoidable Transfers, totaling not less than $212,615.35, to be distributed to the Debtor's unsecured creditors as appropriate under the provisions of the Bankruptcy Code.

174.    The Plaintiffs are entitled to their reasonable costs, and all other relief the Court deems just and proper for their efforts to avoid and recover these fraudulent transfers.

## COUNT THREE (III)

**(Avoidance of Fraudulent Transfers Under Section 544(b) and Section 550 of the Bankruptcy Code and Under D.C. Code § 28-3104(a)(1) and Other Applicable Provisions Against Benjamin Srigley, Cynthia Srigley and Srigley Development Company)**

175.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

176.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable within the meaning of Bankruptcy Code section 502.

54

177.    Plaintiffs were granted derivative standing on _____, 2025, to prosecute, on behalf of the Estate, claims against the Debtor, the Srigleys and Srigley Development Company, and are, in essence, "standing in the shoes of" the Trustee.

178.    The Avoidable Transfers were transfers of interest in the Debtor's property to, or for the benefit of, the Defendants.

179.    At all relevant times, the Debtor had at least one creditor with claims that arose before or after the transfer was made or the obligation was incurred.

180.    The Defendants entered into each Avoidable Transfer with the actual intent to delay, hinder, or defraud any creditor of the Debtor.

181.    Each Avoidable Transfer was accompanied by at least three badges of fraud indicating the fraudulent nature of such transfer, including but not limited to the following:

(i)    the transfers made or obligations incurred were to, or for the benefit of, Benjamin Srigley, Cynthia Srigley and/or the Srigleys jointly, insiders of the Debtor, who exercised dominion and control over the Debtor;

(ii)   the transfers made or obligations incurred were to, or for the benefit of, Srigley Development Company, an entity under common ownership or control with the Debtor;

(iii)  the transfers were made or obligations were incurred at the same time (or shortly before or after) new liabilities and debts were being incurred by the Debtor;

(iv)   the Debtor was or became insolvent at the time of the Avoidable Transfers (or shortly thereafter); and

(v)    before or at the time the transfer was made or obligation was incurred, there was an arbitration action pending against the Debtor, or the imminent threat of such arbitration action.

182.    The primary purpose of the Avoidable Transfers was to take cash from the Debtor,

or otherwise use the Debtor to obtain value, for the benefit of the Srigleys or Srigley

Development Company so that these assets would not be made available to the Debtor's other

creditors.

183.    The Srigleys were not good faith transferees, and therefore are not entitled to the

defenses or protections under D.C. Code § 28-3108 or other applicable law.

184.    The Avoidable Transfers were made within the four (4) years before the Petition

Date and should be avoided pursuant to sections 544(b) and 550 of the Bankruptcy Code and

D.C. Code §§ 28-3107 through 28-3109, as applicable.

185.    The Plaintiffs reserve the right to seek the avoidance and recovery of any and all

additional avoidable transfers that they later discover.

186.    The Avoidable Transfers are recoverable jointly and individually from Benjamin

Srigley and Cynthia Srigleys as alter egos of the Debtor and of Srigley Development Company.

187.    The Plaintiffs are entitled to recover, for the benefit of the Estate, the full amount

of the Avoidable Transfers, totaling not less than $457,070.95, to be distributed to the Debtor's

unsecured creditors as appropriate under the provisions of the Bankruptcy Code.

188.    The Plaintiffs are entitled to their reasonable costs, and all other relief the Court

deems just and proper for their efforts to avoid and recover these fraudulent transfers.

## COUNT FOUR (IV)

**(Avoidance of Fraudulent Transfers Under Section 544(b) and Section 550 of the Bankruptcy Code and and Under D.C. Code § 28-3104(a)(2) and Other Applicable Provisions Against Benjamin Srigley, Cynthia Srigley and Srigley Development Company)**

189.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

190.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable within the meaning of Bankruptcy Code section 502.

191.    Plaintiffs were granted derivative standing on _____, 2025, to prosecute, on behalf of the Estate, claims against the Debtor, the Srigleys and Srigley Development Company, and are, in essence, "standing in the shoes of" the Trustee.

192.    The Avoidable Transfers were transfers of interest in the Debtor's property to, or for the benefit of, the Defendants.

193.    At all relevant times, the Debtor had at least one creditor with claims that arose before or after the transfer was made or the obligation was incurred.

194.    The Debtor did not receive reasonably equivalent value in exchange for each of the transfers or obligations.

195.    At the time of, or as a result of the Avoidable Transfers, the Debtor was engaged in or was about to be engaged in a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the transaction.

196.   At the time of the Avoidable Transfers, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the Debtor's ability to pay as they became due.

197.   The Srigleys were not good faith transferees, and therefore are not entitled to the defenses or protections under D.C. Code § 28-3108 or other applicable law.

198.   The Avoidable Transfers were made within the four (4) years before the Petition Date and should be avoided pursuant to sections 544(b) and 550 of the Bankruptcy Code and D.C. Code §§ 28-3107 through 28-3109, as applicable.

199.   The Plaintiffs reserve the right to seek the avoidance and recovery of any and all additional avoidable transfers that they later discover.

200.   The Avoidable Transfers are recoverable jointly and individually from Benjamin Srigley and Cynthia Srigleys as alter egos of the Debtor and of Srigley Development Company.

201.   The Plaintiffs are entitled to recover, for the benefit of the Estate, the full amount of the Avoidable Transfers, totaling not less than $457,070.95, to be distributed to the Debtor's unsecured creditors as appropriate under the provisions of the Bankruptcy Code.

202.   The Plaintiffs are entitled to their reasonable costs, and all other relief the Court deems just and proper for their efforts to avoid and recover these fraudulent transfers.

### COUNT FIVE (V)

**(Breach of Fiduciary Duties to the Debtor Pursuant to D.C. Code § 29-804.09, and
Other Applicable Provisions Against Benjamin Srigley and Cynthia Srigley)**

203.   Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

204.    At all relevant times described herein, as managers and managing members of the Debtor, Benjamin Srigley and Cynthia Srigley breached their fiduciary duties of loyalty and care, and obligation of good faith and fair dealing owed to the Debtor and its creditors.

205.    The Srigleys engaged in self-dealing and failed to act in the best interests of the Debtor, rather than in their own personal interests. They used the Debtor's assets for personal gain and exploited opportunities of the Debtor for personal advantage.

206.    The Srigleys failed to act with the care an ordinarily prudent person in a like position would exercise under similar circumstances. They failed to act in good faith and with honesty of purpose in all dealings related to the Debtor.

207.    The Srigleys directly benefited from breaching their fiduciary duties and engaging in self-dealing by reaping financial rewards to which they were not entitled. They knew, or had reason to know, that the Debtor and its creditors would be harmed by their breaches of such duties.

208.    As a direct and proximate result of the Srigleys breaching their fiduciary duties and engaging in self-dealing, the Debtor and its creditors sustained significant damages, including but not limited to damages resulting in the deepening insolvency of the Debtor.

209.    As a result of the Srigleys' breaches of fiduciary duty, Plaintiffs are entitled to recover, on behalf of the Estate, the damages suffered by the Debtor in an amount to be proved at trial.

## COUNT SIX (VI)

**(Liability for Improper Distributions Made By the Debtor in Violation of
D.C. Code §§ 29-804.05(a) and 29-804.09 and Pursuant to D.C. Code § 29-804.06,
Against Benjamin Srigley and Cynthia Srigley)**

210.    Plaintiffs re-allege and incorporate herein by reference the allegations contained
in the preceding paragraphs as if set forth in their entirety.

211.    The improper distributions, detailed on **Appendix A** as bank account transfers
from the Operating Account into the Owner Draw Account, into BofA 6378, or taken as cash
withdrawals, were transfers of interest of the Debtor in property.

212.    The improper distributions were made to, or for the benefit of, Benjamin Srigley,
Cynthia Srigley, and/or the Srigleys jointly, managers and managing members of the Debtor, at
all relevant times described herein.

213.    At the time of each improper distribution, (1) the Debtor would not have been
able to pay its debts as they become due in the ordinary course of its activities and affairs; or (2)
the Debtor's total assets were less than the sum of its total liabilities plus the amount that would
have been needed if the Debtor were to be dissolved, wound up, and terminated at the time of the
distribution, to satisfy the preferential rights upon dissolution, winding up, and termination of
members and transferees whose preferential rights would have been superior to those of persons
receiving the distribution.

214.    The improper distributions were made or incurred on or within two (2) years prior
to the Petition Date.

215.    As a result of the Debtor's improper distributions, Plaintiffs are entitled to recover, on behalf of Estate, the damages suffered by the Debtor in an amount to be proved at trial, in an amount totaling not less than $141,410.38.

## COUNT SEVEN (VII)

### (Common Law Conspiracy Against Benjamin Srigley and Cynthia Srigley Pursuant to Applicable D.C. Law)

216.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

217.    At all relevant times described herein, Benjamin Srigley and Cynthia Srigley acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to the Debtor and the creditors of the Debtor.

218.    The unlawful, illegal, and/or oppressive acts include, but are not limited to, conspiring to breach the fiduciary duties they, as officers, etc., owed to the Debtor and its creditors by, among other things, causing or deepening the indebtedness of the Debtor by obtaining unnecessary credit and loans in the Debtor's name, and facilitating fraudulent transfers.

219.    Benjamin Srigley and Cynthia Srigley intentionally combined to accomplish these purposes, which were unlawful, or even if determined to be lawful purposes, were accomplished through illegal and unlawful means.

220.    As a direct and proximate result of the conspiracy and agreement between the Srigleys, the Debtor and the Debtor's creditors sustained significant damages, including but not limited to more than a million dollars of unpaid obligations.

221.     As a result of the conspiracy, Plaintiffs are entitled to recover, on behalf of Estate, the damages suffered by the Debtor and its creditors in an amount to be proved at trial, but likely totaling not less than $1,088,765.67.

## COUNT EIGHT (VIII)

### (Alter Ego Liability Against Benjamin Srigley and Cynthia Srigley)

222.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs as if set forth in their entirety.

223.     The Debtor was an alter ego of Benjamin Srigley and Cynthia Srigley, jointly and severally.

224.     There existed a unity of interest and ownership between the Debtor and the Srigleys such that the separate affairs and personalities of the company and the individuals no longer existed.

225.     Benjamin Srigley was the CEO of the Debtor, and Cynthia Srigley, was its COO. They were the sole members, owners, managers and officers of the Debtor. The Srigleys exercised complete and total domination and control over the Debtor.

226.     The Srigleys failed to keep the Debtor adequately capitalized. Rather, they kept the Debtor in a perpetual state of insolvency by constantly withdrawing cash from the entity and transferring it to themselves, irrespective of the Debtor's overall financial condition and of the fact that the Srigleys had insufficient equity in the Debtor to justify the withdrawals. Rather, their equity in the company was negative.

227.    The Srigleys extensively intermingled the Debtor's funds and assets with their personal funds and assets, or with those of the Debtor's sister entity, Srigley Development Company. They used the Debtor's assets for their personal benefit, including but not limited to the financing and maintenance of the M20K Aircraft, of which Srigley Development Company was the registered owner.

228.    The Srigleys wrongfully used the LLC to protect the Debtor's assets from the claims of creditors by, among other things, fraudulently transferring assets out of the Debtor's accounts and converting the Debtor's assets for their personal use, directly or indirectly, so that those assets would not be available to satisfy the claims of the Debtor's creditors.

229.    The Srigleys disregarded corporate formalities, failing to maintain records that should be prudently kept in the ordinary course of business.

230.    The Srigleys have acted in concert to intentionally abuse and disregard the LLC form of the Debtor in order to defeat justice, perpetrate actual or constructive fraud, violate statutory obligations, and evade contractual responsibility on preexisting liabilities, *inter alia.*

231.    As such, the Srigleys operated the Debtor as a device or sham used to disguise the Srigleys' wrongful conduct.

232.    As a result of their fraudulent or otherwise improper actions, the Srigleys have substantially benefited personally, unjustly enriching themselves to the detriment of the Debtor and its creditors.

233.    Consequently, all funds or other assets that the Debtor is required to return to the Estate should be enforced against the Srigleys personally.

234.    The Plaintiffs, on behalf of the Estate to be distributed appropriately to the

creditors of the Debtor, are entitled to recover all damages asserted in the Complaint, jointly and

severally from Benjamin Srigley and Cynthia Srigley, who acted as the Debtor's alter egos,

totaling not less than $1,088,765.67.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, Federico M. Bandi and Angela M. Bandi,

respectfully request that the Court enter an order and judgment substantially in the form attached

hereto as **Exhibit A**, as follows:

(a)   On Counts I and II, awarding judgment to the Plaintiffs, on behalf of the
Estate, pursuant to section 548 of the Bankruptcy Code, in an amount of the
Avoidable Transfers, and directing the Defendants to pay the Estate an
amount to be determined at trial, totaling not less than $212,615.35, plus the
Plaintiffs' reasonable costs, pursuant to section 550(a) of the Bankruptcy
Code;

(b)   On Counts III and IV, awarding judgment to the Plaintiffs, on behalf of the
Estate, pursuant to sections 544 and 550 of the Bankruptcy Code, D.C. Code
§§ 28-3104, 28-3105 and 28-3107 through 28-3109, or pursuant to other
applicable state fraudulent conveyance or fraudulent transfer law, in an
amount to be proven at trial, totaling not less than $457,070.95, plus the
Plaintiffs' reasonable costs, pursuant to section 550(a) of the Bankruptcy
Code;

(c)   On Count V, awarding judgment to the Plaintiffs, on behalf of the Estate, for
damages caused to the Debtor and its creditors, as a result of the Srigleys'
breaches of fiduciary duties and self-dealing, pursuant to D.C. Code §
29-804.09 or other applicable provisions of the Uniform Limited Liability
Company Act of 2010, D.C. Code § 29-801.01, *et seq.* or applicable common
law, in an amount to be proven at trial;

(d)   On Count VI, awarding judgment to the Plaintiffs, on behalf of the Estate, in
the amount of the improper distributions made by the Srigleys in violation of
D.C. Code §§ 29- 804.05 and 29-804.09 and pursuant to D.C. Code § 29-

804.06, and directing the Defendants to pay the Estate an amount to be determined at trial, totaling not less than $141,410.38;

(e) On Count VII, awarding judgment to the Plaintiffs, on behalf of the Estate, for damages caused to the Debtor and its creditors, as a result of the civil conspiracy of the Srigleys, in an amount to be proven at trial, but totaling not less than $1,088,765.67;

(f) On Count VIII, finding that the Debtor is the alter ego of Benjamin Srigley and Cynthia Srigley, jointly and severally, that the Srigleys are jointly and severally liable for all damages resulting from this Adversary Proceeding, and that the assets of the Srigleys, up to the total amount of allowable claims pursuant to 11 U.S.C. § 502, totaling not less than $1,088,765.67, are property of the Estate;

(g) Awarding the Plaintiffs their reasonable costs incurred in connection with this Adversary Proceeding;

(h) Awarding post-judgment interest at the maximum legal rate running from the date of the judgment until the date the judgment is paid in full, plus costs;

(i) Directing the Defendants to pay forthwith all amounts awarded; and

(j) Granting such other and further relief as this Court deems just and proper.

Dated: April 16, 2025                    Respectfully submitted:


FEDERICO M. BANDI
3606 Chesapeake Street, NW
Washington, DC. 20008
Telephone: 773-612-4163
Email: fbandi1@jhu.edu

-and-


ANGELA M. BANDI
3606 Chesapeake Street, NW
Washington, DC. 20008
Telephone: 773-620-1932
Email: angela.bandi@yahoo.com

*Unsecured Judgment Creditors of
Touchstone Remodelers, LLC,
Filing Pro Se*